USDC SCAN INDEX SHEET

















SWD   9/15/05   9:12
3:05-CV-01777   SONY ELECTRONICS INC V. GUARDIAN MEDIA TECH
*1*
*CMP.*

ORIGINAL

1  Maureen F. Hallahan (SBN 097600)
   Lillian H. Brown (SBN 211775)
2  PROCOPIO, CORY, HARGREAVES
       & SAVITCH, LLP
3  530 B Street, Suite 2100
   San Diego, California 92101
4  Telephone:   619.238.1900
   Facsimile:   619.235.0398
5
   Richard S. Gresalfi
6  Michelle Carniaux
   KENYON
7     & KENYON
   One Broadway
8  New York, New York 10004-1007
   Telephone:   212.425.7200
9  Facsimile:   212.425.5288
10
   Attorneys for Plaintiff
11 SONY ELECTRONICS INC.

12              UNITED STATES DISTRICT COURT

13            SOUTHERN DISTRICT OF CALIFORNIA

14
                                    '05 CV 1777 J   (AJB)
15 SONY ELECTRONICS INC.,
                                    Case No.
16              Plaintiff,
                                    **COMPLAINT FOR**
17    v.                            **DECLARATORY JUDGMENT OF**
                                    **NONINFRINGEMENT,**
18 GUARDIAN MEDIA TECHNOLOGIES, LTD.,  **INVALIDITY, AND**
                                    **UNENFORCEABILITY OF PATENT**
19              Defendant.          **NOS. 4,930,158 AND 4,930,160**

20

21                     **COMPLAINT**

22      Plaintiff Sony Electronics Inc. ("SEL"), for its Complaint against Guardian Media

23 Technologies, Ltd. ("Guardian"), alleges based on personal belief as to itself and on

24 information and belief as to the conduct of Guardian, as follows:

25 *The Parties*

26      1.      SEL is a corporation organized and existing under the laws of the State of

27 Delaware, with its principal place of business at 16530 Via Esprillo, San Diego, California

28 92127.  Sony Electronics Inc. is a subsidiary of Sony Corporation of America ("SCA").

1      2.     Guardian is a domestic limited partnership organized under the laws of the

2 State of Texas.

3      3.     The principal office in the United States where records to Guardian are kept

4 or made available is 4130 La Jolla Village Drive, Suite 107-121, La Jolla, California

5 92037.

6      4.     Guardian has a principal place of business at 4130 La Jolla Village Drive,

7 Suite 107-121, La Jolla, California 92037.

8      5.     The general partners of Guardian are GMT Management Co. and

9 Sightguardian, Inc., both of which having a place of business at 4130 La Jolla Village

10 Drive, Suite 107-121, La Jolla, California 92037.

11      6.     Guardian purports to own U.S. Patent No. 4,930,158 (the "'158 patent"),

12 entitled "Selective Video Playing System," a copy of which is attached as Exhibit 1.

13      7.     Guardian also purports to own U.S. Patent No. 4,930,160 (the "'160

14 patent"), entitled "Automatic Sensorship of Video Programs," a copy of which is attached

15 as Exhibit 2.

16 **Nature of Action**

17      8.     This is an action seeking a declaratory judgment that SEL does not infringe

18 any valid, enforceable claim of the '158 patent or the '160 patent (collectively, the

19 "Guardian patents").

20 **Jurisdiction and Venue**

21      9.     This Court has original jurisdiction over the subject matter of this action

22 pursuant to 28 U.S.C. §§ 1331 and 1338(a), in that it involves substantial claims arising

23 under the United States Patent Act, 35 U.S.C. § 1 *et seq.*

24      10.     This Court may declare the rights and other legal relations of the parties

25 pursuant to 28 U.S.C. §§ 2201 and 2202 because this is a case of actual controversy

26 within the Court's jurisdiction, seeking a declaratory judgment that the Guardian patents

27 are invalid, not infringed and unenforceable.

28    / / /

COMPLAINT FOR DECLARATORY JUDGMENT
RE PATENTS NOS. 4,930,158 AND 4,930,160

999999.902109/555648.02

1     11.    Personal jurisdiction exists over Guardian at least because Guardian has a

2     principal place of business within this district.

3     12.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) because

4     Guardian resides, and is subject to personal jurisdiction, in this district.

5     ***Actual Controversy***

6     13.    SEL is a world-wide leader in consumer and business electronics and

7     designs, manufactures and sells, among other things, televisions and DVD products that

8     include parental rating control technology.

9     14.    Peter S. Vogel ("Mr. Vogel"), sole named inventor of both the Guardian

10    patents, owned and/or controlled the Guardian patents at least through November 28,

11    2003.

12    15.    In a letter to SEL dated September 24, 1999, Mr. Vogel, through his

13    representative Jack Schwartz, Esq., alleged that SEL infringed the Guardian patents by

14    certain of its activities related to the manufacture and sale of televisions and DVD

15    products that contain parental rating control technology.

16    16.    SCA responded to the September 24, 1999 letter in October 24, 1999,

17    indicating to Mr. Vogel that an investigation had begun into the matter, and requesting

18    claim charts.

19    17.    Mr. Vogel provided claim charts to SCA in a letter dated October 28, 1999,

20    which allegedly compared claims of the Guardian patents to certain SEL televisions and

21    DVD products.

22    18.    Correspondence regarding the Guardian patents continued to be exchanged

23    between SCA and Mr. Vogel through May 8, 2000.

24    19.    In a letter to Mr. Vogel dated May 8, 2000, SCA indicated that all of the

25    asserted claims of the Guardian patents are invalid over certain identified prior art.

26    20.    Neither SCA nor SEL received a response to SCA's May 8, 2000 letter.

27    21.    Sony Corporation is a corporation organized under the laws of Japan.  Sony

28    Corporation is the ultimate parent company of SEL.

3

1    22.    Sony Home Electronics Network Company is a business unit of Sony

2  Corporation.

3    23.    After a delay of over four years, Guardian, first through its representatives,

4  contacted Sony Home Electronics Network Company in a letter dated August 31, 2004,

5  offering to license the Guardian patents, and foreign counterparts to these patents. In this

6  letter, Guardian alleged that these patents relate to parental control of home electronics

7  including televisions, DVD players, VCRs and PVRs. The August 31, 2004 letter was

8  followed by four other letters, dated October 26, 2004, December 3, 2004, December 20,

9  2004 and January 30, 2005.

10    24.    SCA responded to the January 30, 2005 letter, and continued to exchange

11  correspondence with Guardian through July 7, 2005. The correspondence from Guardian

12  included claim charts which compared claims of the Guardian patents to an SEL

13  television and an SEL DVD player. In their correspondence, Guardian also stated

14  "Guardian currently believes these comparisons are applicable to all other Sony products

15  that incorporate v-chip [parental rating control] functionality."

16    25.    In a letter dated July 7, 2005 to SCA, Guardian offered Sony a license to the

17  Guardian patents at a specified rate. This letter indicated that the offer is "set to expire on

18  August 31, 2005."

19    26.    SCA did not respond to the Guardian's July 7, 2005 letter.

20    27.    In a letter dated August 24, 2005 to SCA, Guardian demanded "We require

21  a response to Guardian's July 7 letter to you."

22    28.    As a result of Guardian's allegations and general course of conduct, SEL

23  has a reasonable apprehension that Guardian will file suit against SEL. An actual and

24  justiciable controversy exists between SEL and Guardian as to whether SEL infringes any

25  valid and enforceable claim of Guardian's patents by manufacturing and/or selling its

26  televisions and/or DVD products.

27  / / /

28  / / /

4

999999.902109/555648.02

1    *Count I (Declaratory Judgment of Patent Invalidity and Noninfringement)*

2          29.     SEL incorporates by reference, as though fully set forth herein, the

3 allegations contained in paragraphs 1 through 28 above.

4          30.     The manufacture, use, offer for sale and/or sale in the United States of any

5 of SEL's televisions or DVD products does not directly infringe any valid claim of the

6 Guardian patents.

7          31.     SEL does not contribute to the infringement of, or induce others to infringe,

8 the Guardian patents.

9          32.     Each claim of the Guardian patents is invalid for failure to comply with one

10 or more of the requirements of Title 35, United States Code, including, but not limited to,

11 35 U.S.C. §§ 102, 103, and 112.

12    *Count II (Declaratory Judgment of Unenforceability – Laches and Estoppel)*

13          33.     SEL incorporates by reference, as fully set forth herein, the allegations

14 contained in paragraphs 1 through 32 above.

15          34.     Mr. Vogel knew of SEL's allegedly infringing activity at least as early as

16 September 24, 1999.

17          35.     The delay in bringing suit against SEL is unreasonable and inexcusable.

18          36.     SEL suffered material prejudice attributable to the delay.

19          37.     Between Mr. Vogel's May 8, 2000 letter to SCA and Guardian's August 31,

20 2004 letter, neither Guardian nor any previous owner of the Guardian patents suggested to

21 SEL or any other Sony entity that the manufacture, use, or sale of any of SEL's televisions

22 or DVD products would infringe the Guardian patents.

23          38.     After May 8, 2000, SEL continued to manufacture and sell televisions and

24 DVD products under the reasonable belief that the owner of the Guardian patents would

25 not allege that the manufacture, use, or sale of SEL's televisions or DVD products

26 infringed any valid claim of the Guardian patents.

27          39.     SEL relied on the patent owner's misleading conduct.

28    / / /

40.     Due to its reliance on the patent owner's misleading conduct, SEL will be materially prejudiced if Guardian is allowed to proceed with a claim of infringement.

41.     Each of the Guardian patents is now unenforceable with respect to SEL due to equitable estoppel and laches.

### Prayer for Relief

WHEREFORE, SEL respectfully requests:

A.     A Declaratory Judgment that SEL is not liable for directly infringing, or contributing to, or inducing the infringement of, any claim of the Guardian patents;

B.     A Declaratory Judgment that each claim of the Guardian patents is invalid;

C.     A Declaratory Judgment that each of the Guardian patents is unenforceable with respect to SEL; and

D.     Such further relief as the Court may deem just and proper.

Dated: September 14, 2005

Maureen F. Hallahan
Lillian H. Brown
PROCOPIO, CORY, HARGREAVES
    & SAVITCH, LLP

Richard S. Gresalfi
Michelle Carniaux
KENYON
    & KENYON


By: _Lillian H. Brown_
Maureen F. Hallahan
Lillian H. Brown

Attorneys for Plaintiff
SONY ELECTRONICS INC.

6

999999.902109/555648.02

*SONY ELECTRONICS INC. vs. GUARDIAN MEDIA TECHNOLOGIES, LTD*

TABLE OF CONTENTS TO EXHIBITS FOR COMPLAINT FOR
DECLARATORY JUDGMENT OF NONINFRINGEMENT AND
INVALIDITY OF PATENT NOS.4,930,158 AND 4,930,160

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---------|-------------|----------|
| 1 | U.S. Patent No. 4,930,158 entitled "Selective Video Playing System" | 1-11 |
| 2 | U.S. Patent No. 4,930,160 entitled "Automatic Sensorship of Video Programs" | 12-21 |

# EXHIBITS

# United States Patent [19]

## Vogel

[11]  Patent Number:  4,930,158

[45]  Date of Patent:  May 29, 1990

[54]  SELECTIVE VIDEO PLAYING SYSTEM

[76]  Inventor:  Peter S. Vogel, 28 Adeline St., Faulconbridge, NSW 2776, Australia

[21]  Appl. No.:  237,175

[22]  Filed:  Aug. 29, 1988

[30]  Foreign Application Priority Data

Sep. 2, 1987 [AU]  Australia .................................. PI4107

[51]  Int. Cl.⁵ ................................................. H04N 7/16
[52]  U.S. Cl. ............................................ 380/5; 380/20;
380/23; 358/349
[58]  Field of Search ........................ 380/3, 5; 358/349;
340/825.31, 825.34

[56]  References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,225,884 | 9/1980 | Block et al. | ........................... 380/20 |
| 4,528,588 | 7/1985 | Löfberg | ................................. 358/349 |
| 4,595,950 | 6/1986 | Löfberg | .................................. 380/5 |
| 4,670,857 | 6/1987 | Rackman | .............................. 380/5 X |

OTHER PUBLICATIONS

Rae Atkey, "How You Can Censor Your Child's TV Viewing", The News Editorial (Adelaide) 8/25/1986.

Primary Examiner—Stephen C. Buczinski
Assistant Examiner—Bernarr Earl Gregory

[57]  ABSTRACT

A classification code, recorded repeatedly along with program material, is recovered on playing a video recording, and used to inhibit replay if the recovered code matches any of a set of codes specified by the user. The codes which cause replay to be inhibited can be set by the user after entering a personal identity number. The user can optionally request that a code be recorded when recording a program. Signals are optionally provided so that an auxiliary device, such as a second video player, can be controlled in response to codes recovered. One application is to prevent children viewing certain video recordings without parental permission.

22 Claims, 5 Drawing Sheets



EXHIBIT 1

1



Fig. 1

**EXHIBIT 1**

2



OPERATIONAL LOOP

Fig. 2

**EXHIBIT 1**

3



Fig. 3

**EXHIBIT 1**

4



**U.S. Patent**       May 29, 1990       Sheet 4 of 5       **4,930,158**

OVERRIDE



Fig. 4

**EXHIBIT 1**

5

Case 3:05-cv-01777-IEG-MDD   Document 1   Filed 09/14/05   Page 16 of 34

AUXILIARY CONTROL



Fig. 5

EXHIBIT 1

6

4,930,158

**1**

## SELECTIVE VIDEO PLAYING SYSTEM

### FIELD OF THE INVENTION

The present invention relates to methods of, and apparatus for, controlling the playing of video programs recorded on tape or other storage medium. The term video program also includes an accompanying audio signal if any.

### BACKGROUND OF THE INVENTION

With the ready availability of video tape recordings and domestic equipment upon which they can be played, there is a need to restric access of certain groups of people to certain classes of program. For example it might be desired to prevent children viewing certain classes of material, for example pornographic or violent movies. Traditionally, such security needs have been addressed by physically preventing unauthorized persons from having access to restricted recordings. This method is becoming less practical as the availability of both videotapes and machines to play them increases. For example, parents who wish to have pornographic videotapes in the home, for adult viewing only, risks a child finding the tape and playing it in the parent' absence.

It is therefore desirable to provide means whereby display of preselected classifications of program material can be viewed only by authorized persons.

Arrangements for making video pragrams available to only authorised viewers have long been used in the context of subscription television services and the like. These schemes commonly use a form of scrambling to make the signal unintelligible except to authorized persons in possesion of appropriate un-scrambling means. While it would be possible to apply similar techniques to video programs, for example scrambling pornographic movies, this would have the undesired consequence of rendering these tapes unusable to all persons who do not have special replay means. For many purposes, such as the domestic situation cited above, it is desirable that in the default condition, that is when using standard equipment, the tape plays normally. This means that a specially equipped tape player is only required if it is desired to take advantage of the restricted viewing capability.

Prior-art video security means have also been directed to providing control of viewer access by the party from whom the program originates. This is not always satisfactory, for example in the case of parental control of children's viewing, it is desirable that the parent, rather than the publisher or supplier of the video tape, be able to select whether a given tape will be viewable or not.

### SUMMARY OF THE INVENTION

The present invention is directed to providing novel and improved means and method of controlling the playing of video recordings whereby authorised persons can select which classifications of material can be viewed.

According to a first aspect of the present invention, there is provided a video recording playing method comprising the steps of replaying a video program, recovering from the replayed signal a classification code accompanying the recording, comparing the recovered classification signal to a set of user-selected classifications, and depending on the result of this com-

**2**

parison, causing the replay of the program to be suspended or terminated.

According to a second aspect of this inventive concept, apparatus for playing a video recording is provided, comprising video recording replay means, classification code detector means, a comparator equipped to compare the recovered classification code to a set of user-selected classifications, and a controller capable of causing suspension or termination of replay on detection at the output of the comparator a signal indicating equality between the recovered classification code and a set of user-selected classifications.

Some embodiments of this invention also include an arrangement for enabling access to selection of classifications which are to cause suspension or termination of replay only after entering a security code, or personal identification number (PIN), by the user.

In the case of commercially pre-recorded video tapes, the classification code is recorded before distribution to the consumer, for example by the publisher or duplicator of the recordings. In cases where it is desired to control viewing of material recorded privately, for example off-air or by camera, recording means for combining a classification code with the recorded program can be provided as well.

### BRIEF DESCRIPTION OF THE DRAWINGS

An embodiment of the present invention will now be described, by way of example only, with reference to the drawings in which:

FIG. 1 is a schematic block diagram of an embodiment of the invention which includes means for optionally recording classification and program;

FIG. 2 is a schematic diagram of the operational loop of the programme executed by the microcomputer of this embodiment;

FIG. 3 is a schematic diagram of the software used for selecting which classifications cause suspension or termination of playing;

FIG. 4 is a schematic diagram of the software used for overriding the suspension or termination function; and

FIG. 5 is a schematic block diagram of the software used for control of auxiliary devices.

### DETAILED DESCRIPTION

As seen in FIG. 1 this embodiment of the invention comprises the conventional components of a video recorder/player (commonly known as VCR), including record signal processor 2, replay signal processor 4, transport controller 9 and storage medium 3, which is typically a video cassette, but may also be a video disk or any other suitable storage medium.

The operation of this embodiment relies on the presence of a program classification code within the video signal. This can be provided in a number of well known ways which ensure that the presence of such codes do not interfere with the normal viewing of video programs. The method used in this embodiment is encoding of a digital word in the form of black and white transitions located on line 16 of the video signal. This position is chosen so as to be invisible on the CRT display. The technology for this form of signalling is well known, being commonly used for data broadcasting services such as Teletext.

For the purpose of recording a program and inserting a classification code for later use by the invention, clas-

EXHIBIT 1

7

4,930,158

**3**

sification code inserter 12 inserts a code, dictated by microcomputer 6, into line 16 of the video signal as it is recorded.

Classification detector 5 extracts line 16 from the replay signal, and presents the code found therein to an input of microcomputer 6.

Microcomputer 6 is self-contained "single chip computer" including RAM, ROM, IO ports, CPU and NV (non-volatile) memory. Microcomputer 6 may also perform many other functions required by the VCR, in addition to those specific to this invention. One of the output ports of microcomputer 6 controls transport controller 9. Other ports read data from keyboard 7 and send data to display 8.

Keyboard 7 is a press-button key array, which contains keys for control of all the usual VCR functions, as well as special keys used by this invention. The special keys include a SET CLASSIFICATION key, used for entering the classifications of undesired material, and an OVERRIDE key, used to disable the selective playing function and play a recording irrespective of classification. The channel selection keys commonly found on VCRs are used in this embodiment to serve the double purpose of allowing the user to enter a PIN (personal identity number). Similarly, other keys of the VCR can serve double functions if desired.

Display 8 is used to signal the user as required. In this embodiment it comprises an eight character liquid crystal display. In other embodiments other forms of display can be used, including single LEDs or a video character generator which causes characters to be superimposed on the CRT display.

The selective viewing function of the invention is performed by the arrangement of FIG. 1 executing the program described schematically in FIG. 2 while a recordings is being played.

Referring now to FIG. 2, the program starts by scanning the keyboard to test for a key depression. If no key is pressed, the classification code, arriving from classification detector 5, is read, and an address is generated as a function of the code. A table is stored in the memory of microcomputer 6, the address of each data bit of the table corresponding to a unique classification code, and the state of each bit so addressed indicating the classification status, namely ENABLED or DISABLED. A set bit indicates DISABLED, while a clear bit indicates ENABLED. Having generated an address from the received code, microcomputer 6 then applies this address to the table, and tests the corresponding data bit. If the bit is set, microcomputer 6 signals transport controller 9 to stop replay. If the bit is clear, playing continues uninterrupted. This procedure is repeated as a loop at high speed, so that playing is quickly terminated on receipt of a classification code corresponding to undesired program content.

In order to allow authorised users to select whether a given classification code is to be enabled or disabled, the program of FIG. 2 also continually scans the keyboard, testing for depression of the SET CLASSIFICATION key. If this key is pressed, the SET CLASSIFICATION routine is performed, according to FIG. 3.

Referring now to FIG. 3, when the SET CLASSIFICATION key has been pressed, microcomputer 6 first requests, via display 8, that the user enter a PIN (personal identity number). A number is then input, in this embodiment three digits being used for security, and compared to the PIN stored in the NV memory of microcomputer 6. If the number does not match, the

**4**

request is repeated. If the number does match, the first classification group number is displayed, and the user is requested to enter enable or disable, using two designated keys of keyboard 7. If enable is entered, the first bit of the code array is cleared. If disable is entered, the bit is set. A test is then performed to see whether the whole array has been programed. If it has, control is returned to the operational loop, if not, the next array element is addressed, and the input cycle repeated for the next classification code.

In this embodiment the array comprises three bits, corresponding to the classifications:

1. Violent
2. Sexually explicit
3. Adult only

The coding scheme of this embodiment uses an eight bit word, so that up to 256 classifications can be supported. The 253 unused bits of the array are cleared, so that all classifications other than the three listed above are always playable. If desired, this range of classifications can be extended greatly, by increasing the size of the memory array.

When an authorised person, for example a parent, desires to watch a program of disabled classification, it may be inconvenient to re-define the classifications enabled. For convenience, this embodiment provides an override function, which is invoked by pressing the OVERRIDE key of keyboard 7. Depression of this key is detected by the test in the operational loop of FIG. 2, and results in the execution of the override routine of FIG. 4.

Referring to FIG. 4, on entry to the override routine, the PIN is requested from the user. If the PIN does not match the number stored in NV memory, the routine terminates. If the correct PIN has been entered, replay is started, and the program continues looping until the STOP key is pressed, with the result that replay continues until the STOP key is pressed, irrespective of classification.

The operation so far described assumes that the tape being played has been processed so that a classification code is included in the video signal. This is applicable, for example, to pre-recorded tapes which are available for rental, and which have been provided with suitable codes by the supplier. This will also occur if the broadcaster of a program being recorded off-air has included a suitable code in the transmission. In cases where a recording is made of a program which does not contain the code, it is possible, using this embodiment, to include a code in the recording, for subsequent use in restricting viewing.

One way this can be achieved is by entering a code, using keyboard 7, prior to or during recording. Microcomputer 6 sends the input code to classification code inserter 12, where the code is combined with the video signal being recorded. This mode is useful if, for example, a pornographic movie is being recorded off-air by a parent who desires that the children of the household will not be able to replay it.

Another way codes can be recorded is to receive them from a remote source, such as a station where broadcast programs are being monitored and appropriate classifications are being transmitted. In this case, the classification code arriving at classification code input 14 is received by classification receiver 13, which presents the received classification to an input of microcomputer 6. Microcomputer 6 then instructs classification inseter 12 to insert the current code into the recorded

EXHIBIT 1

8

4,930,158

**5**

signal. An application of this technique is to record programs and classifications in cases where classifications might change from time to time, or where the person operating the VCR is not present during the whole recording and is therefore not able to enter classifications manually.

The selective playing function described above is directed to simply terminating replay of a tape which is of a prohibited classification. This is a desirable capability if, for example, the objeive is to prevent children watching pornographic tapes. A further capability of the invention, directed to providing means for replacing unwanted program with programme from another source, will now be described.

Referring again to FIG. 1, microcomputer 6 is provided with auxiliary output 11 and auxiliary input 12, which are used under control of the programs shown schematically in FIG. 5 to provide substitution of alternative programme on detection of prescribed codes.

Referring now also to FIG. 5, on entry to the auxiliary control program, microcomputer 6 starts playing. The detected classification code, recovered from the recording, is then read, and unless the code is a code designated as "REPLACE", the process is repeated until the STOP key is pressed. If a REPLACE code is detected, a signal is sent to auxiliary output 11. On receipt of this signal, an auxiliary device, such as another VCR, responds by playing another recording, and an auxiliary switching device selects the substitute material to be displayed instead of the signal from replay signal output 10. Microcomputer 6 continues reading replayed codes from classification detector 5 until the REPLACE code is no longer detected, at which time microcomputer 6 suspends replay by issuing a suitable command to transport controller 9. The main program tape is now positioned beyond the material to be replaced and ready to resume playing the desired program. When the auxiliary device has finished replaying the substitute program, it sends a signal to auxiliary input 12, which is received by microcomputer 6 which causes replay of the first program to resume. In some cases it may be desirable to advance quickly through unwanted program carrying the REPLACE code, for example using the fast-forward or picture-search capabilities of the transport mechanism. An application of this substitution capability of this embodiment is replacing advertisements within a recorded program with alternative advertisements or information. In this case, the auxiliary device can be a VCR which plays a recording comprising a number of advertisements or messages, each of which is longer in duration than the material to be replaced, ensuring that the main program into which the alternative material is to be inserted resumes without interruption on receipt of the auxiliary input signal at the conclusion of the inserted segment. The main program can consist of a number of segments separated by advertisements to be substituted, carrying REPLACE code, or by short breaks of, say, black program carrying REPLACE code.

The foregoing describes only some embodiments of the invention and modifications, obvious to those skilled in the art, can be made without departing from the scope of the present invention.

For example, in cases where one of several available channels of broadcast program is being recorded prior to subsequent replay, and classification codes are being received from a remote source for combining with the program, it is desirable that each classification code

**6**

received be identified as relating to a particular channel, and only the code relating to the channel being recorded be combined with the recorded signal. This feature is easily added to the embodiments described, especially in cases where the keyboard and microcomputer of the invention are also used to control the channel selection functions of the television receiver.

Whereas the embodiment of the invention described above relies upon signals encoded into the video portion of the video program, the invention can also be effectively implemented using signals embedded into the audio portion of the program using any of the available well-known techniques which do not interfere with normal sound reception.

Whereas the embodiment described above uses control of the tape transport mechanism to inhibit playing, the invention can also be realised using other means of suppressing replay, for example, disabling the output signal without stopping tape motion.

The invention is also not limited to application with tape as the recording medium, being equally suited to use with video disk or any other video storage technique.

The classification code used by this invention can also be used to provide other useful additional functions, such as displaying the title of the program being played, locating a particular program on a videotape, or gathering data for audience research purposes.

What I claim is:

1. A video recording playing method comprising the steps of:

receiving, from a video storage medium, signals representative of a video program,

processing said signals to produce video signals of a form suitable for display,

detecting a classification code within the signals received from the storage medium, said detected code being indicative of a class of program being played,

inputting from the user a security code number, comparing the number input to a stored number and, if the numbers are equal, enabling selection of a set of classification codes which cause at least one of suspension or termination of playing,

comparing the detected code to said set of classification codes, and

selectively playing the video program according to the result of the comparison.

2. A video recording playing method according to claim 1 wherein a classification code has been previously transmitted along with a video program being broadcast, said program and code being stored on a storage medium which is subsequently replayed.

3. A video recording playing method according to claim 1, wherein the classification code forms part of the signal recorded on a video recording which is one of a number of duplicate recordings made available for acquisition by the public.

4. A video recording playing method according to claim 1, comprising the further steps of inputting from the user a code to be recorded along with a video program being recorded, inserting said code into the signal being recorded, recording the combined signals on a video storage medium, and replaying the recorded signal.

5. A video recording playing method according to claim 1, comprising the further steps of receiving a video program from a first source, receiving a classifica-

**EXHIBIT 1**

9

4,930,158

7

tion code from a second source, combining said code with said program, recording the combined signals on a video storage medium, and replaying the recorded signal.

6. A video recording playing method according to claim 1 and including the further step of transmitting to an auxiliary device a signal indicating the classification of program being replayed.

7. A video recording playing method comprising the steps of:

receiving, from a video storage medium, signals representative of a video program,

processing said signals to produce video signals of a form suitable for display,

detecting a classification code within the signals received from the storage medium, said code being indicative of a class of program being played,

comparing the detected code to a set of selected codes,

selectively playing the video program according to the result of the comparison, and

transmitting to an auxiliary device a signal indicating the classification of program being replayed.

8. A video recording playing method comprising the steps of

receiving from a video storage medium signals representative of a video program,

processing said signals to produce video signals of a form suitable for display,

detecting a code within the signal received from the storage medium,

comparing the detected code to a set of selected codes, and, according to a predetermined result of the comparison:

sending a signal to an auxiliary device,

causing playing of the video program to be suspended,

waiting until a resumption signal is received, and resuming replay of the suspended program after receiving the resumption signal.

9. A method as in claim 8 comprising the further steps of inputting, from the user, a security code number, comparing the number input to a stored number, and if the numbers are equal, enabling selection of said set of selected codes.

10. A method as in claim 8 wherein said predetermined result of the comparison is one indicative of material substitution,

and further comprising the step of receiving and playing substitute program material from the auxiliary device until the resumption signal is received.

11. A method as in claim 10 further comprising the step of, during said predetermined comparison result and until said resumption signal is received, advancing playing the material using a fast forward function.

12. A video recording player which displays video on a video display means, comprising:

means for receiving, from a video storage medium, signals representative of a video program,

processing means for converting said signals into video signals of a form suitable for application to the video display means,

means for detecting a classification code within the signal received by the receiving means, said code being indicative of a class of program being played,

input means for accepting from the user a security code number;

8

enabling means for enabling selection of a set of classification codes which cause suspension or termination of playing, said enabling means enabling said selection only if the security code number input is the same as a stored security code number,

means for comparing the detected code to said set of classification codes, and

controller means for selectively playing the video program according to a result of the comparison.

13. A video recording player according to claim 12 including means for recording a video program transmitted from a remote location, said video program containing within the signal a classification code.

14. A video recording player according to claim 12, wherein the classification code forms part of the signal recorded on a video recording which is one of a number of duplicate recordings made available for acquisition by the public.

15. A video recording player according to claim 12, including means for inputting a code from the user, means for receiving video program from a remote source, means for combining said input code with said received program, and means for recording the combined signals on a video storage medium.

16. A video recording player according to claim 12, including means for receiving a video program from a first source, means for receiving a classification code from a second source, means for combining said code with said program, and means for recording the combined signals on a video storage medium.

17. A video recording player according to claim 12, including means for transmitting to an auxiliary device a signal indicating the classification of program being replayed.

18. A video recording player which displays video on a video display means, comprising:

means for receiving, from a video storage medium, signals representative of a video program,

processing means for converting said signals into video signals of a form suitable for application to the video display means,

means for detecting a classification code within the signal received by the receiving means, said code being indicative of a class of program being played,

means for comparing the detected code to a set of selected codes, and

controller means for selectively playing the video program according to a result of the comparison, and

means for transmitting to an auxiliary device a signal indicating the classification of program being played.

19. A video recording player comprising:

means for receiving, from a video storage medium, signals representative of a video program,

processing means for forming video signals of a form suitable for application to a video display means from said signals,

means for detecting a code within the signal received by the receiving means,

means for comparing the detected code to a set of selected codes, and

controller means for, according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received.

EXHIBIT 1

10

4,930,158

**9**

20. A player as in claim **19** further comprising inputting means for inputting, from the user, a security code number, and

means for comparing the number input to a stored number, and if the numbers are equal, enabling selection of said set of selected codes.

21. A player as in claim **19** wherein said predetermined result of the comparison is one indicative of material substitution,

**10**

and further comprising means for receiving and playing substitute program material from the auxiliary device until the resumption signal is received.

22. A method as in claim **21** further comprising fast forward means for, during said predetermined comparison result and until said resumption signal is received, advancing playing the material using a fast forward function.

     • • • • •

EXHIBIT 1

11

# United States Patent [19]

## Vogel

[11]   Patent Number:     **4,930,160**

[45]   Date of Patent:     **May 29, 1990**

[54]   **AUTOMATIC CENSORSHIP OF VIDEO PROGRAMS**

[76]   Inventor:   Peter S. Vogel, 28 Adeline Street, Faulconbridge NSW 2776, Australia

[21]   Appl. No.:   237,176

[22]   Filed:   **Aug. 29, 1988**

[30]       **Foreign Application Priority Data**

Sep. 2, 1987 [AU]   Australia ................................ PI4107

[51]   **Int. Cl.$^5$** .............................................. H04K 1/00
[52]   **U.S. Cl.** ........................................ 380/23; 358/84; 358/349; 455/2; 455/4; 380/20; 340/825.34
[58]   **Field of Search** ....................................... 380/3–5, 380/23, 20; 364/200, 900, DIG. 545; 358/84, 86, 139, 908, 349; 455/2, 4–6, 67–70; 340/825.31, 825.34

[56]             **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,859,457 | 1/1975 | Kirk, Jr. | 358/86 X |
| 3,919,479 | 11/1975 | Moon et al. | 358/84 X |
| 4,331,974 | 5/1982 | Cogswell et al. | 358/86 |
| 4,520,404 | 5/1985 | Von Kohorn | 358/84 X |
| 4,530,008 | 7/1985 | McVoy | 380/23 |
| 4,605,973 | 8/1986 | Von Kohorn | 455/4 X |
| 4,620,229 | 10/1986 | Amano et al. | 358/349 |
| 4,685,131 | 8/1987 | Horne | 358/86 X |
| 4,718,107 | 1/1988 | Hayes | 455/4 |
| 4,750,213 | 6/1988 | Novak | 455/67 |
| 4,814,883 | 3/1989 | Perine et al. | 358/84 X |

*Primary Examiner*—Stephen C. Buczinski
*Assistant Examiner*—Bernarr Earl Gregory

[57]             **ABSTRACT**

A video program is received from a broadcast or video recording and displayed for viewing. On receipt of a prescribed classification code or group of codes display is switched to an alternative source. The classification code can be encoded into the broadcast or tape being viewed, or can originate from a separate source. The alternative material displayed can be another broadcast, a local recording, a locally-generated pattern, or other material. The codes which cause the display to be switched to the alternative source can be set by the user after entering a personal identity number.

**26 Claims, 5 Drawing Sheets**



EXHIBIT 2

**U.S. Patent**     May 29, 1990     Sheet 1 of 5     **4,930,160**



Fig. 1

EXHIBIT 2

**U.S. Patent**    **May 29, 1990**       **Sheet 2 of 5**       **4,930,160**



Fig. 2

**EXHIBIT 2**

14

U.S. Patent     May 29, 1990     Sheet 3 of 5     4,930,160

SET CLASSIFICATION



Fig. 3

EXHIBIT 2

15

**U.S. Patent**        May 29, 1990        Sheet 4 of 5        **4,930,160**

OVERRIDE



Fig. 4

*EXHIBIT 2*

16

# U.S. Patent

May 29, 1990    Sheet 5 of 5    4,930,160



Fig. 5

EXHIBIT 2

17

4,930,160

1

## AUTOMATIC CENSORSHIP OF VIDEO PROGRAMS

### FIELD OF THE INVENTION

The present invention relates to methods of, and apparatus for, automatic censorship of video programs. The term video program used hereinafter refers to television programs broadcast free-to-air or by cable or by satellite, and other forms of mass distribution of video programs, including distribution by video tape or other media. The term also includes an accompanying audio signal if any.

### BACKGROUND OF THE INVENTION

The need for censorship of video material is generally accepted by most societies, for the purposes of preventing the viewing of material by persons other than the target audience. Usually, such censorship takes the form of limiting access of a certain group of people, for example children, to a certain class of material, for example pornographic or violent movies. Other uses of censorship include voluntary self-censorship in cases where a recipient of a program does not wish to be exposed to certain types of program, for example scenes of great violence, advertisements which may be considered offensive, or non-program material which interrupts movies, drama or sports broadcasts.

Being the most widely accessible form of broadcasting, television is the medium with which the problem of censorship is experienced most. Traditionally, censorship of television takes the form of either preventing possibly offensive material from being broadcast in the first place, or voluntary self-censorship, that is, switching off the receiver when material which the viewer does not wish to experience is being broadcast. Another form of self-censorship, which has gained popularity since the introduction of remote controls for television sets is the phenomenon known as "zapping". Zapping involves eliminating unwanted material by muting the receiver or changing channels for the duration of the unwanted segment. While such self-censorship offers the benefit that all classes of material remain available to those who do not find them objectionable, it suffers from the inconvenience of having to anticipate the nature of broadcasts and operate the receiver appropriately. This process is tedious and error-prone, especially where the viewer wishes to suppress program material which changes rapidly in nature, for example when the viewer desires to suppress commercial messages within an otherwise unobjectionable program. Manual censorship is therefore not an entirely satisfactory solution.

It is therefore desirable to provide means whereby display of preselected classifications of program material can be automatically suppressed.

Arrangements for automatic censorship have been previously published, but suffer from a number of serious shortcomings. The main difficulty is that automatic means for discrimination of different program classifications, for example detection of television commercials, have been complex and unreliable. One technique has been to detect television commercials by the short period of black picture and silence separating them from other program material. A typical commercial-deleter of this type is described in U.S. Pat. No. 4,319,286. This system and others like it suffer from the problem that erroneous operation occurs if there is a brief period of black and silence in a broadcast at a time other than at

2

the beginning of a commercial break, or if there is no separation between commercials and other program material. Furthermore, such systems are unable to distinguish between resumption of desired program and further commercials at the conclusion of a commercial. Resumption of viewing or recording must therefore be controlled by some form of timing device, based on assumptions regarding the length of commercial breaks. If these assumptions are not correct, the system will fail in its function.

A much improved censorship means is described in U.S. Pat. No. 4,520,404. This system relies on a human operator to classify broadcasts, based on observation at a monitoring station. A suitably coded message is distributed from the monitoring station to the viewer's home, at which point a suitably-equipped decoder controls the television receiver or video recorder in accordance with the classification data generated by the human operator at the monitoring station. Although this invention significantly improves upon the reliability of previous methods, it nevertheless suffers significant limitations. One limitation is the difficulty of accurately predicting at the monitoring station when a change of program is going to occur, making the system somewhat error prone. Another limitation is that when the system is used under the control of one party to control the viewing of another party, for example used by parents to limit viewing by children, it is necessary to provide control means by which the class of program to be censored can be selected, and it is therefore possible for the other party to use these controls to disable the censorship, thereby defeating the function of the system. Yet another limitation is that during the period that unwanted material is being censored, the receiver is simply disabled. The viewer is therefore periodically presented with a blank screen and/or silence, which may have the undesirable effect of causing alarm when program suddenly resumes, or may be mistaken for a receiver malfunction.

The prior art methods are also deficient in that they do not provide means whereby an authorized person can selectively disable viewing of certain classifications of pre-recorded video programs.

### SUMMARY OF THE INVENTION

The present invention is directed to providing novel and improved means and method of receiving video programs whereby the censorship function is provided automatically, substantially resolving the abovementioned shortcomings of the prior art as well as providing other benefits.

According to a first aspect of the present invention, there is provided a video program receiving method capable of automatically censoring video programs comprising the steps of receiving a video program, with accompanying audio if any, receiving a classification signal indicative of the content of the program being received, decoding the classification signal and, according to functions selected by the user, causing the receiver to direct to its output alternative program material for the duration of program of selected classification.

According to a second aspect of this inventive concept, apparatus for receiving and automatically censoring video program is also provided, and comprises a video program receiver, a classification signal receiver, a controller equipped to decode said received signal and

EXHIBIT 2

18

to control switching means which, according to functions selected by the user at the receiving station, cause the receiver to direct to its output alternative program material for the duration of program of selected classification.

The term "receiver" used herein is defined in the broad sense of apparatus for converting television signals (and their associated sound signals) into visual and audible signals, or apparatus for converting modulated carrier signals into video and/or audio signals suitable for display by video monitors or audition via amplifiers and loudspeakers. For example, the term receiver includes off-air domestic television sets, as well as apparatus known commonly as a "video monitor". The term "receive" is used in the broad sense of accepting signal from any signal conveyance means, for example, from an antenna, cable, optical fiber, magnetic tape, or optical disk.

Some embodiments of this invention also include an arrangement for enabling access to selection of classifications to be censored only upon entering of a security code, or personal identification number (PIN), by the user.

## BRIEF DESCRIPTION OF THE DRAWINGS

Some embodiments of the present invention will now be described, by way of example only, with reference to the drawings in which:

FIG. 1 is a schematic block diagram of a first embodiment of the invention in which the program classification is encoded into the vertical interval of the video signal;

FIG. 2 is a schematic diagram of the operational loop of the program executed by the microcomputer of the first embodiment;

FIG. 3 is a schematic diagram of the software used in either embodiment for setting classifications;

FIG. 4 is a schematic diagram of the software used in either embodiment for overriding the censorship function; and

FIG. 5 is a schematic block diagram of a second embodiment of the invention in which the program classification is received by the invention from a transmission source other than the program to be censored.

## DETAILED DESCRIPTION

As seen in FIG. 1 this embodiment of the invention comprises the conventional components of a television receiver or monitor, including audio amplifier 11, loudspeaker 12, CRT driver 10 and CRT 13. Under normal conditions, the sources of video and audio are selected from video input 3 and audio input 1 respectively. However when the selector means, relay 7 is energized, alternate audio input 2 and alternate video input 4 are selected instead. Both sets of audio and video inputs may derive from any source, for example a television tuner or video tape player.

The operation of this embodiment relies on the presence of a program classification code within the video signal. This can be provided in a number of well known ways which ensure that the presence of such codes do not interfere with the normal operation of television receivers. The method used in this embodiment is encoding of a digital word in the form of black and white transitions located on line 16 of the video signal. This position is chosen so as to be invisible on the CRT display. The technology for this form of signalling is well known, being commonly used for data broadcasting services such as Teletext. The classification may be pre-recorded on tapes being broadcast or played locally, or inserted in a video signal prior to transmission at the broadcasting station at the time of broadcast. The means for inserting such signals is well known.

Upon arrival at video input 3 of the invention, as well as being fed to the display system, the video portion of the program is fed to line code extractor 5, which comprises means for isolating the desired line (in this embodiment line 16), extracting the digital word from that line, and presenting it as an output readable by microcomputer 6.

Microcomputer 6 is a self-contained "single chip computer" including RAM, ROM, IO ports, CPU and NV (non-volatile) memory. Of course, microcomputer 6 may also perform many other functions required by the receiver, as well as those of this invention. One of the output ports of microcomputer 6 controls relay 7. Other ports read data from keyboard 8 and send data to display 9.

Keyboard 8 is a press-button key array, which contains keys for control of all the usual television functions, as well as special keys used by this invention. The special keys include a SET CLASSIFICATION key, used for entering the classifications to be censored, an OVERRIDE key, used to disable the censorship function, and a RESUME key, used to resume censorship after OVERRIDE. The usual channel selection keys of the receiver of this embodiment serve the double purpose of allowing the user to enter a PIN (personal identity number). Similarly, the other keys can serve double functions if desired.

Display 9 is used to signal the user as required. In this embodiment it comprises an eight character liquid crystal display. In other embodiments other forms of display can be used, including single LEDs, or a video character generator which causes characters to be superimposed on the CRT display.

The censorship function of the invention is performed by the arrangement of FIG. 1 executing the program described schematically in FIG. 2.

Referring now to FIG. 2, the program starts by scanning the keyboard to test for a key depression. If no key is pressed, the classification code, arriving from line code extractor 5, is read, and an address is generated as a function of the code. A table is stored in the RAM of microcomputer 6, the address of each data bit of the table corresponding to a unique classification code, and the state of each bit so addressed indicating the classification status, namely ENABLED or DISABLED. A set bit indicates DISABLED, while a clear bit indicates ENABLED. Having generated an address from the received code, microcomputer 6 then applies this address to the table, and tests the corresponding data bit. If the bit is set, relay 7 is energized, causing the video and audio signals to be switched to the alternate sources. If the bit is clear, relay 7 is released, with the opposite effect. This procedure is repeated as a loop at high speed, so that the operation of relay 7 follows instantaneous changes in classification codes arriving at the video input of the invention.

In order to allow authorized users to select whether a given classification code is to be enabled or disabled, the program of FIG. 2 also continually scans the keyboard, testing for depression of the SET CLASSIFICATION key. If this key is pressed, the SET CLASSIFICATION routine is performed, according to FIG. 3.

EXHIBIT 2

4,930,160

5                6

Referring now to FIG. 3, when the SET CLASSIFI-CATION key has been pressed, microcomputer 6 first requests, via display 9, that the user enter the PIN. A number is then input, in this embodiment three digits being used for security, and compared to the PIN stored in the NV memory of microcomputer 6. If the number does not match, the request is repeated. If the number does match, the first classification group number is displayed, and the user is requested to enter enable or disable, using two designated keys of keyboard 8. If enable is entered, the first bit of the code array is cleared. If disable is entered, the bit is set. A test is then performed to see whether the last element of the array has been programmed. If it has, control is returned to the operational loop, if not, the next array element is addressed, and the input cycle repeated for the next classification code.

In this embodiment the array comprises three bits, corresponding to the classifications:
1. Advertisement (commercial product or service promotion)
2. Non-program material (includes advertisements, station identification, community service announcements, commentary during movies etc.)
3. Restricted. Programs deemed by the government censors to be unsuitable for viewing by children.

The coding scheme of this embodiment uses an eight bit word, so that up to 256 classifications can be supported. The 253 unused bits of the array are cleared, so that all classifications other than the three listed above are always enable. If desired, this range of classifications can be extended greatly, by increasing the size of the memory array.

When an authorized person, for example a parent, desires to watch a program of disabled classification, it may be inconvenient to re-define the classifications enabled. For convenience, this embodiment provides an override function, which is invoked by pressing the OVERRIDE key of keyboard 8. Depression of this key is detected by the test in the operational loop of FIG. 2, and results in the execution of the override routine of FIG. 4.

Referring to FIG. 4, on entry to the override routine, the PIN is requested from the user. If the PIN does not match the number stored in NV memory, the routine terminates. If the correct PIN has been entered, relay 7 is released, and the program continues looping until the RESUME key is pressed, with the result that no censoring action occurs until the RESUME key is pressed.

A second embodiment of the invention is shown in FIG. 5. This embodiment is similar to the first embodiment, except that classification codes are received from a source separate from the source of video program. In this case, classification receiver 14 is provided to receive classification signal input 15, which can arrive from any source, for example a radio transmitter distinct from the transmitter broadcasting the video program. This embodiment of the invention is not suited to operation with prerecorded tapes as program source. Operation of this embodiment is the same as the first embodiment, except that classification codes are read from classification receiver 14, rather than line code extractor 5, by microcomputer 6. The software executed by microcomputer 6 is also the same. The capabilities of both embodiments could easily be combined.

The foregoing describes only some embodiments of the present invention and modifications, obvious to those skilled in the art, can be made without departing from the scope of the present invention.

For example, in cases where a broadcast program is being viewed, more than one channel of broadcast is available, and the classification signal is being received from a source other than the broadcast being received, it is desirable that each classification code received be identified as relating to a particular channel, so that censorship can be based on which channel is being viewed or recorded. This feature is easily added to the embodiments described, especially in cases where the keyboard and microcomputer of the invention are also used to control the channel selection functions of the television receiver.

For the purpose of implementing the invention without needing to modify the television receiver, the invention can comprise a standard television receiver in combination with a special controller which controls operation of the receiver by means of the remote control interface of the television receiver, if the receiver is equipped with remote control. That is, the censorship controller is equipped with interface means compatible with the remote control communication standard, for example an infra-red transmitter, so muting, blanking, channel-changing, or other censorship actions can be effected using unmodified receiving equipment. The channel-change function can provide the facility of displaying alternative material during periods of censorship. For example, a suitable pattern generator tuned to an unused television channel could be used to provide "electronic wallpaper" during commercial breaks. In some applications it may be desirable to implement some functions of the invention, such as PIN entry, in the remote controller, and other functions, such as the censorship function, in the receiver.

Whereas the switching means of the embodiments described herein is a relay, any form of suitable switch, such as a solidstate arrangement, can be used.

The alternative material selected during censorship periods can originate from a remote source, for example another television broadcast, or locally, for example from a video disk or tape player. The local source may also be simply a black signal generator. Furthermore, the invention is not limited to providing only one alternative program source.

Whereas one embodiment of the invention described above relies upon signals encoded into the video portion of the received program, the invention can also be effectively implemented using signals embedded into the audio portion of the program, using any of the available well-known techniques which do not interfere with normal sound reception.

What I claim is:
1. A video program reception method comprising the steps of:
    storing in memory means a set of codes descriptive of video program classifications,
    receiving a video signal and associated audio signal if present,
    receiving a program classification code descriptive of said video signal,
    accessing said memory means and comparing the contents thereof with said code, and,
    if the result of said comparison indicates that the received program is to be displayed, causing the received video signal to be selected for display,
    if the result of said comparison indicates that an alternative video signal is to be displayed, causing an

EXHIBIT 2

20

4,930,160

7

alternative source of video signal to be selected for display; and

displaying the selected video signal on a video display means.

2. A video program reception method according to claim 1, wherein the alternative source of video signal originates from a remote transmitter.

3. A video program reception method according to claim 1, wherein the alternative source of video signal is local to the receiving station.

4. A video program reception method according to claim 1, comprising the further steps of:

inputting from the user a personal identity number,

comparing said number to a stored number, and if said numbers are equal,

permitting the user to alter the codes stored within said memory means.

5. A video program reception method according to claim 4, wherein the alternative source of video signal originates from a source remote to the receiver.

6. A video program reception method according to claim 4, wherein the alternative source of video signal is local to the receiving station.

7. A video program reception method according to claim 6, wherein the alternative source of video signal is a local video pattern generator equipped to generate at least a black pattern.

8. A video program reception method according to claim 4, wherein the program classification code is encoded into the video component of the program.

9. A video program reception method according to claim 4, wherein the program classification code is encoded into the audio component of the program.

10. A video program reception method according to claim 4, wherein the program classification code is not encoded into the program being received but is received from a separate source.

11. A video program reception method according to claim 1, wherein the program classification code is encoded into the video component of the program.

12. A video program reception method according to claim 1, wherein the program classification code is encoded into the audio component of the program.

13. A video program reception method according to claim 1, wherein the program classification code is not encoded into the program being received but is received from a separate source.

14. A video program receiver comprising:

a video signal receiver,

a program classification code receiver,

a program classification code memory,

means for accessing said memory and comparing the contents thereof with received codes,

8

selector means equipped to cause a received video signal to be selected for display if the result of said comparison indicates that the received program is to be displayed and to cause an alternative source of video signal to be selected for display if the result of said comparison indicates that an alternative video signal is to be displayed, and

means for displaying the selected video signal.

15. A video program receiver according to claim 14, wherein the alternative source of video signal originates from a remote transmitter.

16. A video program receiver according to claim 14, wherein the alternative source of video signal is local to the receiving station.

17. A video program receiver according to claim 14, further comprising:

means for inputting from the user a personal identity number,

means for comparing said number to a stored number, and control means permitting the user to alter the contents of said memory only if the compared numbers are equal.

18. A video program receiver according to claim 17, wherein the alternative source of video signal originates from a source remote to the receiver.

19. A video program receiver according to claim 17, wherein the alternative source of video signal is local to the receiving station.

20. A video program receiver according to claim 19, wherein the alternative source of video signal is a local video pattern generator equipped to generate at least a black pattern.

21. A video program receiver according to claim 17, including means for deriving the program classification code from the video component of the program.

22. A video program receiver according to claim 17, including means for deriving the program classification code from the audio component of the program.

23. A video program receiver according to claim 17, including means for receiving program classification code from a source other than the program being received.

24. A video program receiver according to claim 14, including means for deriving the program classification code from the video component of the program.

25. A video program receiver according to claim 14, including means for deriving the program classification code from the audio component of the program.

26. A video program receiver according to claim 14, including means for receiving program classification code from a source other than the program being received.

*  *  *  *  *

EXHIBIT 2

21

AO 120 (Rev.3/04)

| TO:          Mail Stop 8<br>Director of the U.S. Patent and Trademark Office<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 | REPORT ON THE<br>FILING OR DETERMINATION OF AN<br>ACTION REGARDING A PATENT OR TRADEMARK |
|---|---|

In Compliance with 35 U.S.C. § 290  and/or 15 U.S.C. § 1116 you are hereby advised
that a court action has been filed in the U.S. District Court San Diego on the following Patents or Trademarks:

| DOCKET NO.<br>05CV1777 J | DATE FILED<br>9/14/05 | U.S. DISTRICT COURT<br>United States District Court, Southern District of California |
|---|---|---|
| PLAINTIFF<br>Sony Electronics, Inc. | | DEFENDANT<br>Guardian Media Tech |

| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1 4,930,158 | 5/29/90 | Peter Vogel |
| 2 4,930,160 | 5/29/90 | Peter Vogel |
| 3 | | |
| 4 | | |
| 5 | | |

In the above-entitled case, the following patent(s)/trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment    ☐ Answer    ☐ Cross Bill    ☐ Other Pleading |
|---|---|

| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above-entitled case, the following decision has been rendered or judgment issued:

| DECISION/JUDGMENT |
|---|

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|

Copy 1 - Upon initiation of action, mail this copy to Director    Copy 3 - Upon termination of action, mail this copy to Director
Copy 2 - Upon filing document adding patent(s), mail this copy to Director    Copy 4 - Case file copy

ORIGINAL

OJS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)   PLAINTIFFS | DEFENDANTS |
|---|---|
| SONY ELECTRONICS INC. | GUARDIAN MEDIA TECHNOLOGIES, LTD. |

FILED

05 SEP 14 AM 11: 53

| (b) County of Residence of First Listed Plaintiff <u>San Diego, California</u><br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant <u>San Diego, California</u>  U.S. DISTRICT COURT<br>(IN U.S. PLAINTIFF CASES ONLY) SOUTHERN DISTRICT OF CALIF<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
|---|---|

(c) Attorney's (Firm Name, Address, and Telephone Number)
Maureen F. Hallahan, Esq./Lillian H. Brown, Esq.
Procopio, Cory, Hargreaves & Savitch LLP
530 B. Street, Suite 2100
San Diego, CA 92101
(619) 238-1900

Attorneys (If Known)

BY:                              DEPUT

**'05 CV 1777 J    (AJB)**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government
        Plaintiff

☒ 3   Federal Question
        (U.S. Government Not a Party)

☐ 2   U.S. Government
        Defendant

☐ 4   Diversity
        (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>      & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>      Student Loans<br>      (Excl. Veterans)<br>☐ 153 Recovery of Overpayment<br>      of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>      Liability<br>☐ 320 Assault, Libel &<br>      Slander<br>☐ 330 Federal Employers'<br>      Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>      Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>      Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury—<br>      Med. Malpractice<br>☐ 365 Personal Injury—<br>      Product Liability<br>☐ 368 Asbestos Personal<br>      Injury Product<br>      Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>      Property Damage<br>☐ 385 Property Damage<br>      Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br>      of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational<br>      Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>      28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☒ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>      Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br>      Exchange<br>☐ 875 Customer Challenge<br>      12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information<br>      Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>      Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities –<br>      Employment<br>☐ 446 Amer. w/Disabilities –<br>      Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate<br>      Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards<br>      Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting<br>      & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc.<br>      Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>      or Defendant)<br>☐ 871 IRS—Third Party<br>      26 USC 7609 | ☐ 900 Appeal of Fee Determination<br>      Under Equal Access<br>      to Justice<br>☐ 950 Constitutionality of<br>      State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1   Original
        Proceeding

☐ 2   Removed from
        State Court

☐ 3   Remanded from
        Appellate Court

☐ 4   Reinstated or
        Reopened

☐ 5 Transferred from
    another district
    (specify)

☐ 6   Multidistrict
        Litigation

Appeal to District
☐ 7 Judge from
    Magistrate
    Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §§ 2201 and 2202; 35 U.S.C. § 1, et seq.                **35: 0145 SD**

Brief description of cause:
Declaratory Judgment that Defendant's patents are invalid, unenforceable and not infringed.

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
    UNDER F.R.C.P. 23

DEMAND $ Declaratory Judgment   CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes  ☒ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE
09-14-05

SIGNATURE OF ATTORNEY OF RECORD
*Lillian H. Brown*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

117117   $250.00

American LegalNet, Inc.   www.USCourtForms.com