Frank L. Tobin, SBN 166344
Marsha Amin, SBN 238820
PROCOPIO, CORY, HARGREAVES & SAVITCH, LLP
530 B Street, Suite 2100
San Diego, California 92191

Richard S. Gresalfi (Admitted Pro Hac Vice)
Michelle Carniaux (Admitted Pro Hac Vice)
KENYON & KENYON LLP
One Broadway
New York, New York 10004

Attorneys for Plaintiff Sony Electronics Inc.

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONY ELECTRONICS INC., <br><br> Plaintiff, <br><br> v. <br><br> GUARDIAN MEDIA TECHNOLOGIES, LTD., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CIV. NO. 05-CV-1777-IEG-AJB
(Consolidated Lead Case)

**CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION OF NON-GUARDIAN PARTIES FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF UNITED STATES PATENT NO. 4,930,158**

Date:   July 27, 2009
Time:   10:30 a.m.
Judge: Hon. Irma E. Gonzalez
Courtroom: 1

THOMSON INC.,

            Plaintiff,

v.

GUARDIAN MEDIA TECHNOLOGIES, LTD.,

            Defendant.

CIV. NO. 07-CV-1613-IEG-AJB
(Consolidated)

PANASONIC CORPORATION and
VICTOR COMPANY OF JAPAN, LTD,

            Plaintiffs,

v.

GUARDIAN MEDIA TECHNOLOGIES, LTD.,

            Defendant.

CIV. NO. 05-CV-1796-IEG-AJB
(Consolidated)

| | |
|---|---|
| MITSUBISHI DIGITAL ELECTRONICS AMERICA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIV. NO. 05-CV-1780-IEG-AJB |
| v. | ) (Consolidated) |
| | ) |
| GUARDIAN MEDIA TECHNOLOGIES, LTD., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| GUARDIAN MEDIA TECHNOLOGIES, LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIV. NO. 08-CV-1859-IEG-AJB |
| v. | ) (Consolidated for Discovery) |
| | ) |
| PHILIPS ELECTRONICS NORTH AMERICAN CORPORATION, TOSHIBA AMERICA CONSUMER PRODUCTS, L.L.C., and TOSHIBA AMERICA, INC., | ) |
| | ) |
| Defendants. | ) |

**TABLE OF CONTENTS**

Page(s)

INTRODUCTION .................................................................................................................... 1

NATURE AND STATE OF PROCEEDINGS .................................................................... 2

BACKGROUND ...................................................................................................................... 5

    A.    The Asserted Claims of the '158 Patent Are Directed to a Dual-Player System to Replace Unwanted Portions of a Video Program Playing on One Device with Alternative Material from a Second, Auxiliary Device ................... 5

    B.    The Asserted Claims of the '158 Patent Require a Comparison of a Detected Code with a Set of Selected Codes ................................................. 9

    C.    The Accused DVD Players Are Not Dual Player Systems Designed to Replace Unwanted Content Within a Playing Video Program ................................... 10

        1.    Operation of Accused DVD Players with Parental Control Disabled............. 10

        2.    Setting the Parental-Control Feature on the Accused Players......................... 11

        3.    Operation of Accused DVD Players with Parental Control Enabled.............. 12

ARGUMENT .......................................................................................................................... 15

    I.    THE ACCUSED DVD PLAYERS DO NOT HAVE AN "AUXILIARY DEVICE" ASSOCIATED WITH THEM AS THE CLAIMS REQUIRE ................. 17

    II.    THE ACCUSED DVD PLAYERS DO NOT PLAY A VIDEO PROGRAM AND THEN SUSPEND OR RESUME THE PLAYING VIDEO PROGRAM...................................................................................................... 19

    III.    THE ACCUSED DVD PLAYERS DO NOT COMPARE A DETECTED CODE TO A SET OF SELECTED CODES ................................................. 22

    IV.    THERE IS NO INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS ................................................................................................. 22

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ballard Med. Prods. v. Allegiance Healthcare Corp.*,
268 F.3d 1352 (Fed. Cir. 2001) ......................................................... 15, 16, 25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................. 15

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008) ......................................................... 24, 25

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999) ........................................................... 25

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l Inc.*,
389 F.3d 1370 (Fed. Cir. 2004) ......................................................... 16

*Freedman Seating Co. v. American Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005) ......................................................... 23

*Gaus v. Conair Corp.*,
363 F.3d 1284 (Fed. Cir. 2004) ......................................................... 18

*Int'l Rectifier Corp. v. IXYS Corp.*,
361 F.3d 1363 (Fed. Cir. 2004) ......................................................... 16

*Lemelson v. Gen. Mills, Inc.*,
968 F.2d 1202 (Fed. Cir. 1992) ......................................................... 16

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) ............................................................. 15, 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................. 15

*Moore U.S.A., Inc. v. Standard Register Co.*,
229 F.3d 1091 (Fed. Cir. 2000) ......................................................... 23

*PC Connector Solutions LLC v. SmartDisk Corp.*,
406 F.3d 1359 (Fed. Cir. 2005) ......................................................... 15

*Phillips v. AWH Corp.*,
415 F.3d. 1303 (Fed. Cir. 2005) ........................................................ 16

*Rheox, Inc. v. Entact, Inc.*,
276 F.3d 1319 (Fed. Cir. 2002) ......................................................... 16

*Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ......................................................... 18

-ii-

*Sony Elecs. Inc. v. Guardian Media Tech.,*
    497 F.3d 1271 (Fed. Cir. 2007) .................................................................................. 2, 3

*Storage Tech. Corp. v. Cisco Sys., Inc.,*
    329 F.3d 823 (Fed. Cir. 2003) .................................................................................. 24, 25

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) .................................................................................. 16

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,*
    520 U.S. 17 (1997) .................................................................................. 16

**Statutes**

Fed. R. Civ. P. 56(c) .................................................................................. 15

35 U.S.C. § 112 .................................................................................. 17

35 U.S.C. § 271 .................................................................................. 17

This consolidated action concerns a patent dispute between the "Non-Guardian Parties"—seven manufacturers/suppliers of consumer electronic products[1]—and Guardian Media Technologies, Ltd. ("Guardian")—a company formed by a patent attorney solely to exploit the two, now-expired patents-in-suit, U.S. Patent Nos. 4,930,158 ("the '158 Patent") and 4,930,160 ("the '160 Patent"). Both patents relate to methods and devices for censoring video programs. Through this motion, the Non-Guardian Parties request that the Court grant a summary judgment that they did not infringe the asserted claims of the '158 Patent (claims 8-11 and 19-22) by their sale of DVD players and player/recorders ("DVD players") during the term of the '158 Patent.

The United States Patent and Trademark Office ("PTO") recently re-examined all twenty-two claims of the '158 Patent and concluded that claims 1-7 and 12-18 were unpatentable and only claims 8-11 and 19-22 were patentable. Although for nine years Guardian and its predecessor had asserted that ordinary, stand-alone DVD players such as those sold by the Non-Guardian Parties were covered by the '158 Patent, until the PTO's recent decision, Guardian and its predecessor had never asserted that anyone who made or sold such players infringed claims 8-11 or 19-22—and for good reason; the asserted claims do not relate to stand-alone DVD players.

Instead, the claims are directed to a dual-player system designed to selectively replace offensive portions of a video program (e.g., a recorded movie) being played from one (main) device with alternative program material being played from another (auxiliary) device. Specifically, alternative program material played by one device (an auxiliary device, such as a second VCR) is substituted for unwanted content contained within a video program played by a main device (e.g., a first VCR). Play of the video program on the main device continues until the presence of unwanted material in the program is detected. The display is then switched over to the alternative program material played by the auxiliary device. While the auxiliary device is playing, the video program on the main device is advanced until it has passed through the unwanted

---

[1] The "Non-Guardian Parties" are Plaintiffs Sony Electronics Inc., Mitsubishi Digital Electronics America, Inc., Thomson, Inc., Panasonic Corporation and Victor Company of Japan, Ltd., and Defendants Toshiba America Consumer Products, L.L.C. and Toshiba America, Inc. ("Toshiba").

-1-

content, at which point it is suspended until play of the substitute alternative program material from the auxiliary device is completed. Play of the video program on the main device is then resumed and displayed. *See* A.9 at 5:6-59; A.10-A.11 at claims 8-11, 19-22.[2]

Control of the replacement operation is based upon comparing a code received from a storage medium (e.g., a video cassette tape) containing the video program with a set of codes pre-selected by the user corresponding to various classifications, such as violence or sexually explicit material. Each classification is either enabled or disabled based upon the user's preference. A.8 at 3:37 - 4:22.

There is no genuine dispute of material fact that the stand-alone DVD players that the Non-Guardian Parties sold during the term of the '158 Patent do not have the claimed attributes: there is no *auxiliary device*; and, because the video program is not *played* before the parental-control-menu screen appears, it cannot be *suspended* or *resumed* as required. Moreover, there is no comparison to a set of codes, but rather comparison to just a single code. Any one of these three grounds is sufficient, by itself, for the Court to grant the Non-Guardian Parties' present motion and summarily dispose of Guardian's infringement claims based on the '158 Patent.

### NATURE AND STATE OF PROCEEDINGS

This dispute began ten years ago, in 1999, as described by the United States Court of Appeals for the Federal Circuit in an opinion reversing a dismissal of the declaratory judgment actions ("DJ Actions") in 2006, which are now consolidated in this case. *See Sony Elecs. Inc. v. Guardian Media Tech.*, 497 F.3d 1271, 1273 (Fed. Cir. 2007) (describing the pre-suit chronology and finding it "undisputed"). As described in the opinion, in 1999, Vogel (the inventor named on the '158 Patent) began accusing some of the Non-Guardian Parties of infringing claims 1, 12 and 14 of the '158 Patent. *Sony*, 497 F.3d at 1274, 1276, 1279.

Unlike the dual-player, program-segment-blocking system described in now-asserted claims 8-11 and 19-22 of the '158 Patent, claims 1, 12 and 14 that Vogel asserted in 1999 were

---

[2] "A.__" refers to documents attached to the *Declaration of Richard S. Gresalfi* ("Gresalfi Decl."), which accompanies this memorandum of points and authorities.

different claims that encompassed selectively playing or blocking *an entire* video program (not just *an unwanted portion* of the video program). In such a video player, there is no playing of a video program at all. The user is either permitted to play the entire video program, or the entire video program is blocked. Objectionable material within a video program is not replaced by alternative program material from a second, auxiliary device as contemplated by the now-asserted claims.

In about mid-2000, the Non-Guardian Parties advised Vogel that the claims he asserted were invalid and not infringed. *Id.* Vogel never responded. Vogel never asserted the now-at-issue claims 8-11 and 19-22. Guardian's disinterest in the now-asserted claims was the same as Vogel's—until just recently. In about 2004, after acquiring the '158 Patent, Guardian, like Vogel, advised the industry of its purported infringement—again, of claims 1, 12 and 14 (*see Sony*, 497 F.3d at 1275-77, 1279)—but never asserted claims 8-11 and 19-22.

In September 2005, the Non-Guardian Parties (except for Toshiba) brought suit in this Court, requesting a declaration that Guardian's patents were invalid, unenforceable and not infringed. (*See, e.g.*, D.I. 1, 15).[3] At about the same time, the Non-Guardian Parties filed a reexamination request, and the PTO decided to reexamine all claims of the '158 Patent. (*See* D.I. 12). After receiving a rejection of claims from the PTO, Guardian's response was to *cancel* from the '158 Patent the only two independent claims now-at-issue (claims 8 and 19) and to continue to pursue the broader claims directed to selectively playing or blocking *an entire* video program.

In mid-2008, Guardian's effort to convince the PTO to confirm the patentability of the entire-program-blocking claims that it had asserted against the Non-Guardian Parties for years was running out of steam; and, indeed, Guardian gave up on these claims and ultimately cancelled them. A.94. At the same time, Guardian resurrected previously cancelled claims 8 and 19, and convinced the PTO to confirm their patentability by arguing for a narrow construction—which it is now seeking to improperly broaden. The PTO issued the Reexamination Certificate for the '158 Patent in November 2008.

---

[3] "D.I. __" refers to the Court's docket index in the lead case, No. 3:05-cv-01777-IEG-AJB.

-3-

In anticipation of the allowance of these claims, at a status conference in October 2008, Guardian's counsel advised the Court:

> [W]e are evaluating whether or not it makes sense at this point for us to assert [the '158 Patent]. And, you know, our evaluation shows that if there is a legitimate claim to be made on that patent, then we would seek to amend our counterclaim and assert it.

A.169 at 23:4-9.

After nine years of ignoring claims 8-11 and 19-22 and even going so far as to voluntarily give up most of those claims during the course of the reexamination, Guardian apparently decided that it did "make[] sense" to assert the claims and that such an assertion would be "legitimate." Consequently, in November 2008, Guardian requested leave to amend its answers to add counterclaims for infringement of claims 8-11 and 19-22 of the '158 Patent. (D.I. 129). Over the Non-Guardian Parties' objection, the Court permitted the amendment. (D.I. 146). Just before the amendment, Guardian sued Toshiba in this Court on the '158 Patent as well.

Recently, on June 1, 2009, Judge Real of the Central District of California in *Guardian Media Techs., Ltd. v. Coby Elecs. Corp.*, No. 08-08439-R-RC (C.D. Cal.), granted summary judgment of noninfringement to Nintendo of America Inc. ("Nintendo") on the basis that Nintendo's "Wii" video-game system does not play "video programs" as claimed in the '158 Patent. *See* A.291-A.297. Judge Real entered a final judgment on June 9, 2009. A.298-A.299.

The Non-Guardian Parties now request that the Court summarily dispose of Guardian's infringement assertions on the '158 Patent, because, as a matter of law and undisputed fact, they are not legitimate. Discovery has just begun in this case. (*See* D.I. 168). Early disposition of Guardian's facially meritless claims would conserve the time and resources of the Court, as well as the parties.

-4-

**BACKGROUND**

A.    **The Asserted Claims of the '158 Patent Are Directed to a Dual-Player System to Replace Unwanted Portions of a Video Program Playing on One Device with Alternative Material from a Second, Auxiliary Device**

The '158 Patent is entitled "Selective Video Playing System." A.1.  It is directed, in general, to a method and means of "controlling the playing of video recordings whereby authori[z]ed persons can select which classifications of material can be viewed."  A.7 at 1:57-61. The patent describes use of "conventional components of a video recorder/player (commonly known as VCR), including . . . [a] storage medium [], which is typically a video cassette, but may also be a video disk or any other suitable storage medium."  *Id.* at 2:49-54.  As the patent explains:

> With the ready availability of video tape recordings and domestic equipment upon which they can be played, there is a need to restrict access of certain groups of people to certain classes of program.  For example it might be desired to prevent children viewing certain classes of material, for example pornographic or violent movies.

*Id.* at 1:12-18.

Importantly, the '158 Patent describes and claims *two* embodiments—(1) preventing play of an *entire* video program that is of a prohibited classification, and (2) playing a video program, but replacing unwanted program *portions* with program material from a second, auxiliary device (that is, the dual-player system).  The first embodiment—directed to preventing play of an entire video program—is described in the '158 Patent at column 3, line 33, to column 5, line 6.  The '158 Patent then describes the second embodiment, with the following introduction:

> The *selective playing function described above is directed to simply terminating replay of a tape* which is of a prohibited classification. This is a desirable capability if, for example, the objective is to prevent children watching pornographic tapes.  *A further capability of the invention, directed to providing means for replacing unwanted program with programme from another source*, *will now be described.*

A.9 at 5:7-14 (emphasis added).

The second embodiment—in which a video program is replayed, but unwanted portions are replaced with program material from another source—is then described at column 5, lines 15

-5-

through 59 and in connection with the flowchart of Figure 5 of the patent.[4]  The microcomputer of this second embodiment sends a signal to an "auxiliary device" which is "used . . . to provide substitution of alternative programme on detection of prescribed codes."  *Id.* at 5:15-19.  Thus, if the microcomputer determines that the main program material should be replaced, a signal is sent to the auxiliary device which produces suitable replacement programming.  As the patent explains:

> On receipt of this signal, an auxiliary device, such as another VCR, responds by playing another recording, and an auxiliary switching device selects the substitute material to be displayed instead of the [material from the] replay signal output.  [The] [m]icrocomputer continues reading replayed codes from [the] classification detector until the REPLACE code is no longer detected, at which time [the] microcomputer suspends replay by issuing a suitable command to [the] transport controller.  The main program tape is now positioned beyond the material to be replaced and ready to resume playing the desired program.  When the auxiliary device has finished replaying the substitute program, it sends a signal to [the] auxiliary input, which is received by [the] microcomputer, which causes replay of the first program to resume.

*Id.* at 5:26-41 (reference numerals omitted).

This operation is illustrated in Figure 5 of the patent, entitled "AUXILIARY CONTROL."[5]  The patent exemplifies the "auxiliary device" only by reference to "a second video player" (A.1 at Abstract), "another VCR" (A.9 at 5:27-28) or "a VCR" (*id.* at 5:49).  The VCR "play[s] another recording" of "substitute material" (*id.* at 5:28-30) or "advertisements or messages, each of which is longer in duration than the material to be replaced, ensuring that the main program into which the alternative material is to be inserted resumes without interruption on receipt of the auxiliary input signal at the conclusion of the inserted segment" (*id.* at 5:50-55).  Figure 1 illustrates the video player described in the patent (A.2 at Figure 1; A.7-A.8 at 2:48 - 3:36); it shows an arrow leading out from the player with a label "Auxiliary output 11," but does not show any auxiliary device itself.

---

[4]  The '158 Patent clearly uses the term "replay" synonymously with "play" to refer to the playing of pre-recorded video program material.  *See, e.g.*, A.7 at 1:36-40 (stating that scrambling undesired video program content "would have the undesired consequence of rendering these tapes unusable to all persons who do not have special *replay* means" (emphasis added)).

[5]  A chart correlating the relevant text of the '158 Patent with Figure 5 of the patent is provided at A.290.

Claims 8 and 19 of the '158 Patent are directed to the second embodiment, as are their respective dependent claims; namely, claims 9-11 and 20-22. Both claims 8 and 19 (and, of course, the claims that depend from them) require "processing [signals representative of a video program] to produce video signals of a form suitable for display," "sending a signal to an auxiliary device," "causing playing of the video program to be suspended," and "resuming replay of the suspended program after receiving [a] resumption signal," exactly as described at column 5, lines 15 through 59 and shown in Figure 5 of the patent. Claims 8 and 19 read:

**8.** A video recording playing method comprising the steps of 25
    receiving from a video storage medium signals representative of a video program,
    processing said signals to produce video signals of a form suitable for display, 30
    detecting a code within the signal received from the storage medium,
    comparing the detected code to a set of selected codes, and, according to a predetermined result of the comparison: 35
    sending a signal to an auxiliary device,
    causing playing of the video program to be suspended,
    waiting until a resumption signal is received, and resuming replay of the suspended program after 40 receiving the resumption signal.

**19.** A video recording player comprising:
    means for receiving, from a video storage medium, 55 signals representative of a video program,
    processing means for forming video signals of a form suitable for application to a video display means from said signals,
    means for detecting a code within the signal received 60 by the receiving means,
    means for comparing the detected code to a set of selected codes, and
    controller means for, according to the result of the comparison, sending a signal to an auxiliary device, 65 to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received.

A.10 at 7:24-41 (emphasis added); 8:53-68 (emphasis added).

The requirements of "processing," "suspending" and "resuming" the video program necessarily mean that claims 8 and 19 (and their dependent claims) embrace only those situations

-7-

in which the play of a video program has already started, rather than preventing play of a video program before it ever starts; that is, they are directed to the second embodiment described in the '158 Patent as discussed above. Indeed, during the reexamination, Guardian itself defined the "suspending" limitation by stating that:

> This claim element *requires*, even if only briefly, that the video program be first *playing* in order to be subsequently suspended.

A.104. It then relied on this construction of the "processing" and "suspending" limitation to distinguish several prior art references that control "descrambling" based on parental settings. Guardian argued that in such descrambling systems "the signal is not processed to produce a video signal of a form suitable for display *as presently claimed; instead, the received scrambled signals remain scrambled and by definition are not suitable for display*" and, therefore, "there is no playing of the video program that can be suspended *as required in the pending claims.*" A.105.

The Examiner agreed with Guardian's interpretation of "playing," by stating:

> The Examiner agrees that *the claims require* "processing video signals to produce [a] video signal of a form suitable for display.["] *The claims require* the *playing* of a video program and then the suspension of the program.

A.138. Moreover, to explain how claims 8-11 and 19-22 were distinguished over a prior art reference to Olivo, the Examiner further emphasized that the claims are *not* directed to blocking entire programs such as MPAA-rated movies:

> Olivo discloses the ability to prevent the playing of the program in its entirety or only certain portions. In regards to the *non-replaying* of the program based on its MPAA ratings, no resumption signal is contemplated because the entire program will be edited out, *thus suspending and resuming the video program will not occur.*

A.136. Thus, the Examiner specifically found, and stated, that the "suspending" and "resuming" limitations of claims 8-11 and 19-22 are *not* met when preventing playback of an *entire video program*—i.e., a recorded movie—based upon its MPAA ratings. Guardian made no objections to these statements. Based upon these clear statements by the Examiner limiting the claims to the

-8-

second embodiment, and Guardian's silence, the meaning of claims 8-11 and 19-22 was confirmed and accepted during the reexamination of the '158 Patent.

Undeterred by the clear meaning of the claims, and the contrary positions taken before the PTO, Guardian now asserts that the claims cover (in a single device), the blocking of entire programs and that an override function that permits the playing of a blocked program meets the "resumption" requirement of the claims. An override function is described in the '158 Patent at column 4, lines 32-39 in connection with the *first* embodiment. There, it is stated that if a correct PIN is entered, replay of a blocked program is "started."[6] Essentially, despite the clear statements by both Guardian and the Examiner limiting the claims to the second embodiment, Guardian now contends that these claims also cover the first embodiment.

**B.    The Asserted Claims of the '158 Patent Require a Comparison of a Detected Code with a Set of Selected Codes**

The asserted claims require "comparing the detected code to a set of selected codes." The claim language expressly requires the received code to be compared to *plural* codes—that is "a *set of codes*." The specification is consistent with the claim requirement. As explained at column 3 beginning at line 37 (*see* A.8), *each bit* stored in a table in the microcomputer "correspond[s] to a unique classification code." The table thus contains the set of classification codes—the claimed "set of selected codes" contains more than one code, each of which has been assigned a value by the user. *Id.* The received code is compared to this set of classification codes to determine if the received program contains material corresponding to any one of the plural classifications and should therefore be blocked. The classification codes are independent from each other; e.g., the user can decide to allow violent scenes but prohibit sexually explicit scenes by setting each bit as desired. In this way, a user can choose to block material based upon any or all of multiple different content characteristics.

---

[6] *See* n. 4, *supra* p. 6 (discussing how the '158 Patent uses the term "replay" to refer to the playing of video program material that was previously recorded).

-9-

### C. The Accused DVD Players Are Not Dual Player Systems Designed to Replace Unwanted Content Within a Playing Video Program

Guardian has accused, and provided claim charts under Patent L.R. 3.1 for, a single DVD player or player/recorder ("DVD players") from each Non-Guardian Party (A.205). Guardian asserts that these claim charts are representative of how all DVD players of each Non-Guardian Party infringe the asserted claims. The manner in which all of the charted players operate, for the purposes of this motion, is undisputed, and is illustrated here with specific reference to the Sony accused stand-alone DVD player, model DVP-NS400D (depicted at the right) and a DVD disc that supports parental lock.[7] The specific disc used to demonstrate operation of the accused players contains the movie "Star Wars II: Attack of the Clones" (the "Star Wars Disc"), which has a MPAA rating of PG. Guardian itself used this disc when demonstrating the operational features of the accused players in connection with its motion to amend its counterclaims. (*See* D.I. 135 and Declaration of Steven W. Hartsell ("Hartsell Decl.") attached thereto). The operation described below is consistent in all material respects with Guardian's previous representations to this Court concerning the operation of the accused, charted players. (*See id.*, Hartsell Decl. at ¶¶ 12-21).



#### 1. Operation of Accused DVD Players with Parental Control Disabled

The accused exemplar Sony DVD player, DVP-NS400D, is a stand-alone DVD player. It is not a system comprising two or more players. As shown below in Figures 1-6, when the accused Sony DVD player has its parental-control feature *disabled*, the movie on a disc may be played regardless of its rating. When the player is powered on, "insert disc" appears on the television screen (Figure 1). When the "open/close" button is depressed, the disc tray opens and "open" appears on the screen (Figure 2). When the Star Wars Disc is inserted and the "open/close" button is depressed again, the disc tray closes and "close" appears on the screen (Figure 3). The

---

[7] The accompanying *Declaration of Richard S. Gresalfi* details the operation of the DVD players that Guardian accuses in its Infringement Contentions, except for Thomson's accused player. The operation of that player is detailed in the *Declaration of Andrew M. McCoy*, which also accompanies this memorandum of points and authorities.

-10-

FBI copyright warning then appears on the screen (Figure 4), followed by the international copyright warning (Figure 5) followed by the MPAA rating (Figure 6). Gresalfi Decl. at ¶¶ 13-20.



Figure 1 (No Parental Control)



Figure 2 (No Parental Control)



Figure 3 (No Parental Control)



Figure 4 (No Parental Control)



Figure 5 (No Parental Control)



Figure 6 (No Parental Control)

A main menu is subsequently displayed, such as that shown in Figure 7 below. Only after "play movie" is selected will the movie feature begin to play. *Id.* at ¶¶ 21-22.

Figure 7 (No Parental Control)



### 2. Setting the Parental-Control Feature on the Accused Players

Parental control in the accused DVD players is set from control menus. On the exemplar Sony player, the control menus can be accessed by depressing the "display" button on the remote control. Selecting "custom" and then "custom setup" allows you to access the "parental-control"

-11-

menu (Figure 8).  *Id.* at ¶¶ 23-28.  Upon selecting "parental control," a screen appears requesting a password (Figure 9).  Upon entering the password, a single desired parental control-level can be set (e.g., G or PG or PG-13) (Figure 10).  *Id.* at ¶¶ 29-32.

**Figure 8 (Set Parental Control)**     **Figure 9 (Set Parental Control)**     **Figure 10 (Set Parental Control)**

  

### 3. Operation of Accused DVD Players with Parental Control Enabled

When the accused DVD players have their parental control-feature *enabled* and set at a level that would block a PG rated disc, such as the Star Wars Disc, rather than showing the FBI warning and proceeding on to the main menu as described above, a parental-control message is displayed on the television screen when such a disc is inserted in the DVD player.  When the exemplar Sony DVD player is powered on, "insert disc" appears on the screen (Figure 11).  When the "open/close" button is depressed, the disc tray opens and "open" appears on the screen (Figure 12).  When the Star Wars Disc is inserted and the "open/close" button is depressed again, the disc tray closes and "close" appears on the screen (Figure 13).  These screens, Figures 11-13, are the same as those in Figures 1-3, above.  *Id*. at ¶¶ 14-17, 33-36.

**Figure 11 (Parental Control On)**     **Figure 12 (Parental Control On)**     **Figure 13 (Parental Control On)**

  

Next, as shown in Figure 14 below, a screen immediately appears with 20th Century Fox logos and a message: "*The Parental Level of the Player Has Been Set.  Press 'Yes' to Continue.*"

-12-

This screen also has two selectable options: "Yes" and "Stop." *Id.* at ¶ 37. Figure 14 is not shown during normal play, that is, it is not shown when the parental control is turned off. *Id.* at ¶¶ 13-21.

**Figure 14 (Parental Control On)**



**Figure 15 (Parental Control On)**



If "Stop" is selected at the screen shown in Figure 14, the screen in Figure 15 appears with the following message: "*This Movie Will Not Play Due to the Current Parental Level Setting of the Player. Please Eject the Disc.*" *Id.* at ¶¶ 38-39. If "Yes" is selected at the screen shown in Figure 14, additional instructions are superimposed on top of the screen, requesting the viewer to indicate whether he or she would like to temporarily change the parental control to a level which would permit viewing of the programming on the disk (Figure 16). If "Yes" selected at this juncture, a password is requested (Figure 17). *Id.* at ¶¶ 46-47.

**Figure 16 (Parental Control On)**



**Figure 17 (Parental Control On)**



Upon entry of the correct password, the parental control is disabled. Then, the FBI copyright warning appears on the screen (Figure 18), followed by the international copyright warning (Figure 19) followed by the MPAA rating (Figure 20). *Id.* at ¶¶ 48-50.

-13-


**Figure 18 (Parental Control On)**


**Figure 19 (Parental Control On)**


**Figure 20 (Parental Control On)**

The main menu is subsequently displayed, as shown in the example below (Figure 21), and only after "play movie" is selected will the movie start to play. *Id.* at ¶¶ 51-52.[8]


**Figure 21 (Parental Control On)**

Thus, after the correct PIN is entered (that is, when the parental control is deactivated), the subsequent sequence is exactly the same as when the parental control was turned off from the beginning. *Compare* Figures 4-7, *supra* p. 11, with Figures 18-21, *supra* p. 14.

There is no dispute that this is how the exemplar Sony DVD player operates, and there is no dispute that this is how all of the accused (charted) DVD players operate (with the look of the superimposed parental-control screens being different for different players as shown in the Gresalfi and McCoy Declarations, which accompany this motion). Moreover, unlike the system described and claimed in the '158 Patent, the accused (charted) stand-alone DVD players do not have any associated *auxiliary device*, and the video program is not initially *played* and, therefore, is never *suspended* or *resumed* so as to allow substitution of alternate program material from an auxiliary

---

[8] Should the Court grant the Non-Guardian Parties' Joint Motion for Leave to File a Non-Electronic Exhibit, a copy of the Star Wars Disc will be submitted in conjunction with this motion, for the Court's convenience.

-14-

Sony v. Guardian                                                                      CIV. NO. 05-CV-1777-IEG-AJB
CORRECTED MEMO. OF POINTS AND AUTHORITIES ISO NON-GUARDIAN PARTIES' JOINT MSJ OF NON-INFRINGEMENT
sd-478782

device.  There is also no comparison to *a set* of selected codes as required by the claims.  Summary judgment here is plainly appropriate on any of these three separate and independent grounds.

## ARGUMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2009).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If a nonmoving party cannot establish a genuine issue for trial on any essential element of its claim, then the moving party is entitled to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

A determination of infringement (or lack thereof) of a U.S. patent requires a two-step analysis.  *See, e.g., PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1362 (Fed. Cir. 2005).  First, the Court must ascertain the scope of the claims as a matter of law.  *See id.*; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc).  Construction of the claims need not be an exhaustive process, "[a]s long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes."  *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) (affirming summary judgment of noninfringement without providing a complete claim construction because disputed terms were properly construed to exclude the structures that were used in the accused device).  Second, a determination is made as to whether the properly construed claims cover the accused device, either literally ("literal infringement") or under the doctrine of equivalents ("infringement by equivalents").  *See PC Connector*, 406 F.3d at 1362, 1364.  This second step is a question of fact; however, when there are no genuine issues of material fact in dispute between the parties, a court's grant of summary judgment is proper.  *See id.* at 1364; *Ballard Med. Prods.*, 268 F.3d at 1362.

*Step One: Claim Construction.*  The claims define the scope of the patented invention.

-15-

*Phillips v. AWH Corp.*, 415 F.3d. 1303, 1312 (Fed. Cir. 2005) (en banc). The words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art, and "must be read in view of the specification, of which they are a part." *Id.* at 1312-1313, 1315. The prosecution history should also be considered in ascertaining the scope of the claims since it provides evidence of how the PTO and the inventor understood the invention. *Id.* at 1317; *see Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996).

*Step Two: Infringement*. Literal infringement requires that each and every claim limitation appear in an accused product. *E.g.*, *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004). Where literal infringement is not present, infringement under the doctrine of equivalents may be found where the "accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *see also Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004) (a finding of infringement requires that every claim limitation or its equivalent be found in the accused device).

There are three separate and independent grounds here that support summary judgment of non-infringement. First, the charted, stand-alone DVD players that the Non-Guardian Parties made and sold during the term of the '158 Patent do not have the claimed *auxiliary device*. Second, the accused players do not initially *play* a video program as the properly construed claims require and, therefore, do not *suspend* or *resume* any played *video program* as a matter of law. Third, there is no comparison to a set of selected codes as required by the claims. These are pure questions of law, as there is no dispute as to the operation of the accused DVD players as related to this motion. *See Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1324 (Fed. Cir. 2002) ("where the parties do not dispute any relevant facts regarding the accused product[s] but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment"); *see also Ballard Med. Prods.*, 268 F.3d at 1362 ("Because there is no dispute over the structure of the accused device, resolution of the claim

-16-

construction issue in this case dictates the outcome of the infringement inquiry.").

## I. THE ACCUSED DVD PLAYERS DO NOT HAVE AN "AUXILIARY DEVICE" ASSOCIATED WITH THEM AS THE CLAIMS REQUIRE

Claim 8 of the '158 Patent, as well as claims 9-11 which depend from claim 8, are method claims, requiring the step of "sending a signal to an auxiliary device."[9] Claim 19, as well as claims 20-22 which depend from claim 19, are apparatus claims, requiring "controller means for . . . sending a signal to an auxiliary device."[10]   In its Patent L.R. 3.1 infringement contentions, Guardian simply says that the accused, charted DVD players "send[] a signal to an auxiliary device *inside* the [p]layer[s]."  *See, e.g.*, A.215 (emphasis added).   Guardian did not identify any component within the DVD players that is the alleged "auxiliary device."   When briefing its motion to amend its counterclaims, however, Guardian did suggest that the claimed "auxiliary device" was the component or components *inside* the accused DVD players that generated the text of the menu screens (and that the text of the menu screen was the substitute material, even though Guardian did not identify any material the "substitute material" allegedly replaced).  *See, e.g.*, D.I. 129 at Exhibit 1, p. 2; D.I. 135 at pp. 8-9.

Construction of the term "auxiliary device" is a matter of law for the Court to decide.  *See Markman*, 52 F.3d at 970-71.  The appropriate meaning for the term in light of the claim language and specification of the '158 Patent is *a playback device, such as another VCR, that is physically separate from the video player that plays back the video program, and is the source of substitute program material.*

First, from the claim language itself, the "auxiliary device" is something that is separate from the claimed video player or video playing method.  Claim 19 calls for "[a] video recording

---

[9]  Patent L.R. 3.1(b) required Guardian to specify each accused infringing act of which it is aware. Guardian not only failed to identify any accused act, it failed to identify who performed the accused act.  To the extent Guardian claims that the Non-Guardian Parties are indirect infringers, it has not specified whether the Non-Guardian Parties are allegedly contributory infringers or whether they have somehow induced others to carry out the claimed methods.  *See* 35 U.S.C. § 271 (b) and (c).

[10]  Although this claim element is clearly governed by paragraph 6 of 35 U.S.C. § 112, Guardian failed to identify in its infringement contentions the structure that performs the claimed function of "sending a signal to an auxiliary device."  *See* Patent L.R. 3.1(c).

-17-

player" and recites structure in the video recording player that operates to send a signal "to an auxiliary device." Grammatically, the auxiliary device is something separate from the claimed "video recording player"—the claimed controller means included within the "video recording player" sends a signal *to* the "auxiliary device." In addition, the use of the term "auxiliary device" logically means a device that is separate from the claimed video recording player. *See, e.g.*, *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004) ("the clear implication of the claim language is that the pair of probe networks is a distinct component, separate from the electrical operating unit of the claimed invention"). Similarly, method claim 8 requires playing a program and sending a signal "to an auxiliary device." That auxiliary device must be *auxiliary* to something, and it is only logical that it is auxiliary to the device that is playing the video program.

Just as in *Gaus*, "the specification confirms that interpretation." *Id.* at 1388. The '158 Patent exemplifies the "auxiliary device" only by reference to "a second video player," "another VCR" or "a VCR." This second VCR "play[s] another recording" of "substitute material" (A.9 at 5:28-30) or "advertisements or messages, each of which is longer in duration than the material to be replaced, ensuring that the main program into which the alternative material is to be inserted resumes without interruption on receipt of the auxiliary input signal at the conclusion of the inserted segment" (*id.* at 5:50-55).

Moreover, the '158 Patent *separately* describes internal components that are part of the video player that generate messages as "Display 8" and have nothing to do with providing substitute material. As the patent states, "[d]isplay 8 is used to signal the user as required." It can be "an eight character liquid crystal display" or "single LEDs or a video character generator which causes characters to be superimposed on the CRT display." A.8 at 3:27-32. Tellingly, such an internal component is never identified in the patent as an auxiliary device to which signals are sent from the video player. By disclosing an internal character generator for *other* purposes and never identifying it as an "auxiliary device for providing substitute material," the '158 Patent specification makes clear that such an internal generator cannot fall within the scope of the claim limitations that require a signal to be sent to an auxiliary device. *See Scimed Life Sys., Inc. v.*

-18-

*Advanced Cardiovascular Sys., Inc.* 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."). Here, both the claim language and the specification demonstrate that an internal character generator is outside the scope of the claims.

## II. THE ACCUSED DVD PLAYERS DO NOT PLAY A VIDEO PROGRAM AND THEN SUSPEND OR RESUME THE PLAYING VIDEO PROGRAM

Claim 8 requires "causing playing of the video program to be suspended" and "resuming replay of the suspended program after receiving the resumption signal." A.10 at 7:24-41. Similarly, claim 19, requires controller means "to cause playing of the video program to be suspended" and "to resume playing of the suspended program when the resumption signal is received." *Id.* at 8:53-68.

In its Patent L.R. 3.1 infringement contentions, Guardian fails to identify the initial playing of the video program that it so strenuously argued during reexamination was required by the claims, much less the suspension and resumption of any playing video program. Rather, with respect to the exemplar Sony device, Guardian simply refers to a message—"THE PARENTAL LEVEL OF THE PLAYER HAS BEEN SET. PRESS 'YES' TO CONTINUE" (*see* Figure 14, *supra* p. 13)—that appears when attempting to play a disc that exceeds the set parental-control level. Guardian's position, as explained in a paper submitted in connection with its motion to add the '158 Patent to the case, appears to be that because this screen is generated from the disc, it represents both playing of the video program as well as its suspension:

> In Guardian's testing, [the Non-Guardian Parties'] DVD players started playing the program and reading information from a DVD disc prior to suspending the program to display a parental control warning. This is evidenced by the fact that when Guardian inserted [the Star Wars Disc (a 20th Century Fox movie)] into [the] accused DVD players (which automatically started the "play" process), the players read the inserted disc and displayed the "20th Century Fox" logo on the associated display screen. The tested players obviously read and displayed this information from the inserted disc. The players then suspended the program (with the logo frozen on the

-19-

Sony v. Guardian                  CIV. NO. 05-CV-1777-IEG-AJB
CORRECTED MEMO. OF POINTS AND AUTHORITIES ISO NON-GUARDIAN PARTIES' JOINT MSJ OF NON-INFRINGEMENT
sd-478782

screen) until a resumption signal was entered and sent (i.e., the proper parental control password was entered).

(D.I. 135 at 8-9 (footnotes omitted)).

Guardian's assertions boil down to accusing a parental-control screen menu of being *part of* the "video program" whose playback is to be controlled. As a matter of law, the parental-control-menu screen cannot be part of the claimed "video program." Indeed, the United States District Court for the Central District of California has already held against Guardian on this issue in a related case (*Guardian Media Techs., Ltd. v. Coby Elecs. Corp., et al.*, No. 08-08439-R-RC), finding that the '158 Patent's claim limitation "video program" means "recorded movies, broadcast television programs, and cable television programs." A.296 at ¶ 14. Accordingly, the accused DVD players do not infringe the asserted claims of the '158 Patent, because there is no *playing, suspending* or *resumption* of a video program, that is, there is no *playing, suspending* or *resumption* of a recorded movie, broadcast television program or cable television program.

The parental-control-menu screen shown in Figure 14 is not a "video program" that is played, suspended or resumed because it is not a recorded movie, broadcast television program or cable television program at all. Moreover, this screen is obviously played only as a "result of the comparison" as set forth in the claims and must therefore come *after* the required initial playing of the video program.[11] Guardian, however, cannot point to any such initial playing. Nothing else from the disc containing the video program comes before the parental-control-menu screen. Guardian's assertion above is based on the nonsensical logic that the parental-control-menu-screen is displayed first as part of "playing" and *before* any comparison and *then* the video program is suspended ("frozen"). This analysis falls flat in view of the fact that such a screen, which indicates that the parental level has been set, can only be played *after* the required comparison. The parental-control-menu screen is simply not a part of the video program whose viewing is to be controlled, but instead is part of the parental-control functionality of the DVD player.

---

[11] For example, the parental-control-menu screen is *not* played when the parental-control function is turned off. If the parental-control-menu screen was a part of the video program, it would be played *any time* the video program was played, regardless of the setting of the parental-control function.

-20-

1    Guardian attempts to collapse the spinning up and reading of any data from a disc into

2    "playing" of a video program contained on the disc.  Guardian's own statement, however, makes it

3    clear that the parental-control data is read first, resulting in the display of the parental-control-

4    menu screen when the parental-control settings dictate, and the video program itself is only played,

5    *from the beginning,* when the parental-control function is overridden.

6        Whatever the term "video program" means, the intrinsic evidence results in the "video

7    program" *not* including parental-control functionality.  In the '158 Patent, Guardian disclosed two

8    embodiments.  The first embodiment provided for parental override via PIN.  *See* A.8 at 4:23-39.

9    When the parental-control functionality of the first embodiment was set to block certain content,

10   the parental-control lock engaged and blocked the video program before any playing of the

11   program, *see id.* at 3:37-55; A.9 at 5:7-11; thereafter, the user could play and view the blocked

12   program, from the beginning, only by entering the correct PIN, *see* A.8 at 4:23-39.  Thus, in the

13   specification, Guardian distinguished between the "video program" and parental-control

14   functionality.

15       Moreover, in the reexamination, Guardian admitted that the parental-control-menu screen

16   was not the "video program" when it stated, "one of skill in the art would recognize that the

17   password entry screen would be displayed if the video program is not played."  A.83.  A clear

18   distinction was also drawn in the reexamination between, on one hand, the operation of the first

19   embodiment and, on the other hand, the claims asserted in this case.  First, Guardian cancelled all

20   the claims covering the first embodiment.  *See* A.126.  That is, Guardian canceled the claims

21   "directed to simply terminating replay of a tape which is of a prohibited classification."  *See* A.9 at

22   5:7-11.  Moreover, the Patent Examiner narrowly (and correctly) construed "suspending" to

23   exclude from the scope of claims 8-11 and 19-22 the first embodiment described in the '158

24   Patent, which prevents play of an entire video program, *see* A.131, and further concluded that the

25   steps of "suspending" and "resuming" (as recited in claims 8-11 and 19-22) do not encompass

26   preventing play of an entire video program, *see id.*  Guardian's attempt to include the parental-

27   control-menu screen as part of the video program is diametrically opposed to the intrinsic evidence

28                                                    -21-

in the case. Indeed, the very screen that Guardian points to as playing a video program is the same functionality—parental-control functionality—that is described in the '158 Patent and discussed in the prosecution history as not being the "video program."

## III. THE ACCUSED DVD PLAYERS DO NOT COMPARE A DETECTED CODE TO A SET OF SELECTED CODES

The asserted claims require "comparing [a] detected code to a set of selected codes." The language is clearly set forth as requiring the received code to be compared to *plural* codes—a *set* of *codes* means exactly what it says. *See* p. 9, *supra*. In contrast, the accused DVD players do not have any ability to compare a received code to a set of codes. The well-known MPAA rating system is essentially an age rating system and only provides for comparison to a *single* code, i.e., the preset age rating. There is no ability to compare a received MPAA code to a set of plural codes for different classifications such as violence, sexually explicit material, language and the like.

Such comparison to a single code is in direct contrast to a comparison to plural codes as described and claimed in the '158 patent, and as is done, for example, in the U.S. TV Parental Guidelines (*see* http://www.tvguidelines.org/ratings.htm), which provides for separate and independent content labels D, L, S, V and FV that indicate whether a program contains suggestive dialogue, coarse or crude language, sexual situations, violence or fantasy violence, respectively.

## IV. THERE IS NO INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

The doctrine of equivalents is not available to Guardian. With respect to the "auxiliary device," the patentee disclosed it narrowly, as a separate device, such as a "second video player" or "another VCR." A.1 at Abstract; A.9 at 5:27-28. As discussed above, in view of the plain language of the specification and claims of the '158 Patent, the proper construction of "auxiliary device" is *a playback device, such as another VCR, that is physically separate from the video player that plays back the video program, and is a source of substitute program material.* Guardian apparently believes that an *internal* character generator in the accused DVD players can serve as an equivalent to the "auxiliary device." But because the claimed "auxiliary device" must

-22-

be "*separate from the video player that plays back the video program and a source of substitute program material*," it cannot be an *internal* component of the "device that plays back the video program," such as the accused DVD players.  Indeed, the "auxiliary device" must be some device—such as a VCR—*external* to the accused DVD players.

The Federal Circuit has made clear that "an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation."  *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) (holding that an accused "rotatably mounted" support member is not equivalent to a claimed "slidably mounted" support member).  Here, *internal* is the exact opposite of *separate* and *external* and, as such, is not "an insubstantial change from the claimed subject matter."  *See Freedman*, 420 F.3d at 1359; *see also Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) ("[T]he term 'majority' is not entitled to a scope of equivalents covering a minority . . . .  [I]t would defy logic to conclude that a minority—the very antithesis of a majority—could be insubstantially different from a claim limitation requiring a majority, and no reasonable juror could find otherwise.").  Thus, the internal character generator in the accused DVD players is not, as a matter of law, equivalent to the claimed "auxiliary device."

For precisely the same reasons, a single code cannot be the equivalent of a set of codes.  A set of codes is the very antithesis of a single code.

Further, despite disclosing an internal character generator—"Display 8"—for other purposes (A.8 at 3:7-14, 27-32), the '158 Patent neither discloses nor claims the use of Display 8 as an "auxiliary device."  The fact that Display 8 is disclosed, however, indicates that the patentee reasonably could have foreseen, at the time of prosecution, the use of Display 8 as an "auxiliary device"; but the patentee failed to claim it (or even disclose it) as usable for that purpose.  So, now, Guardian is barred from claiming as an equivalent during litigation what during prosecution it could have claimed (or, at the very least, disclosed) but did not.  *See Freedman*, 420 F.3d at 1361 ("[A]s between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection

-23-

for [a] foreseeable alteration of its claimed structure." (citation omitted)); *see also Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 835-36 (Fed. Cir. 2003) (rejecting plaintiff's broad interpretation of the term "forwarding device" because there was "no suggestion in the claim language or in the written description that the term could refer to an entire network" and affirming summary judgment of no infringement under the doctrine of equivalents to preclude any assertions by plaintiff that "any communication network may be the equivalent of a forwarding device").

Moreover, by failing to disclose that an internal character generator could serve as the claimed "auxiliary device," the '158 Patent was not examined during prosecution on the basis that the meaning of "auxiliary device" was broad enough to encompass such a character generator. *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("Claims should not be construed 'one way in order to obtain their allowance and in a different way against accused infringers.'" (citation omitted)). Accordingly, Guardian cannot disclose the use of an internal character generator for other, limited purposes—in essence hiding or disclaiming its use as an "auxiliary device" and thereby avoiding broad examination in the PTO—and now, during litigation, argue that such a character generator is somehow equivalent to the claimed "auxiliary device." *Cf. Storage Tech.*, 329 F.3d at 835-36 (rejecting plaintiff's broad interpretation of the term "forwarding device" because there was "no suggestion in the claim language or in the written description that the term could refer to an entire network" and affirming summary judgment of no infringement under the doctrine of equivalents to preclude any assertions by plaintiff that "any communication network may be the equivalent of a forwarding device").

With respect to the "playing" and "suspended" limitations, Guardian is estopped from arguing that *not* playing the video program is the equivalent of playing the video program, due to the specific arguments it made during reexamination: Guardian argued that the "suspend[ing]" limitation "requires, even if only briefly, that the video program be first playing in order to be subsequently suspended." A.104. Guardian then relied on this construction to distinguish several prior art references. *See* A.105. "The doctrine of prosecution disclaimer 'protects the public's reliance on definitive statements made during prosecution' by 'precluding patentees from

-24-

recapturing through claim interpretation specific meanings [clearly and unmistakably] disclaimed during prosecution.'" *Computer Docking*, 519 F.3d at 1374-75. By "clearly characterizing the invention in a way to try to overcome rejections based on prior art," Guardian made "'a clear and unmistakable disavowal of scope during prosecution.'" *See id.* at 1374. Accordingly, *not* playing the video program, as occurs when the parental-control screen is displayed by the accused players, cannot, as a matter of law, be the equivalent of playing a video program. *See Storage Tech.*, 329 F.3d at 836 (affirming summary judgment of no infringement under the doctrine of equivalents based on arguments made during prosecution regarding the existence of a "forwarding device" in distinguishing the invention over prior art, the existence of which plaintiff was now estopped from asserting was "unnecessary"); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 981 (Fed. Cir. 1999) (finding no infringement under the doctrine of equivalents as a matter of law because during prosecution the patentee distinguished its claims from the features alleged to be equivalent in the accused devices); *see also Ballard Med. Prods.*, 268 F.3d at 1362 ("The same distinctions of the prior art that inform the claim construction in this case give rise to prosecution history estoppel and prevent the doctrine of equivalents from capturing structure that the patentee surrendered during prosecution."). The intrinsic evidence and, in particular, the Reexamination prosecution history, set forth that the parental-control functionality is separate from the video program. Moreover, the prosecution history shows that Guardian itself advocated that playing the video program was a necessary precursor to the occurrence of the "suspend[ing]" step. Therefore, none of the accused DVD players infringe the asserted claims of the '158 Patent, either literally or under the doctrine of equivalents.

## CONCLUSION

There is no genuine dispute of material fact that the DVD players that the Non-Guardian Parties made and sold do not have at least three of the claimed attributes: first, sending a signal to an *auxiliary device*; second, *suspending* a playing video program; and third, comparison with a *set of selected codes*. Any of these grounds is sufficient for the Court to grant the Non-Guardian Parties' motion here, and they respectfully request that the Court do so.

-25-

Dated: June 26, 2009        By:        /s/ Frank L. Tobin
                                        Frank L. Tobin, SBN 166344
                                        Marsha Amin, SBN 238820
                                        PROCOPIO, CORY, HARGREAVES &
                                        SAVITCH, LLP

                                        Richard S. Gresalfi (Admitted Pro Hac Vice)
                                        Michelle Carniaux (Admitted Pro Hac Vice)
                                        Rose Cordero (Admitted Pro Hac Vice)
                                        KENYON & KENYON LLP

                                        Attorneys for Plaintiff Sony Electronics, Inc.


Dated: June 26, 2009        By:        /s/ Frank L. Tobin
                                        Frank L. Tobin, SBN 166344
                                        Marsha Amin, SBN 238820
                                        PROCOPIO, CORY, HARGREAVES &
                                        SAVITCH, LLP

                                        Morton Amster (Admitted Pro Hac Vice)
                                        Anthony F. Lo Cicero (Admitted Pro Hac
                                        Vice)
                                        Michael J. Berger (Admitted Pro Hac Vice)
                                        AMSTER ROTHSTEIN & EBENSTEIN

                                        Attorneys for Plaintiff Panasonic Corporation
                                        and Victor Company of Japan, Ltd.


Dated: June 26, 2009        By:        /s/ Vincent J. Belusko
                                        Brian M. Kramer, SBN 212107
                                        Vincent J. Belusko, SBN 100282
                                        Scott C. Moore, SBN 203181
                                        MORRISON & FOERSTER LLP

                                        Attorneys for Plaintiff Mitsubishi Digital
                                        Electronics America, Inc.


Dated: June 26, 2009        By:        /s/ Samuel R. Hellfeld
                                        Samuel R. Hellfeld, SBN 234421
                                        FOLEY & LARDNER LLP

                                        R. Trevor Carter (Admitted Pro Hac Vice)
                                        Daniel M. Lechleiter (Admitted Pro Hac Vice)
                                        Andrew M. McCoy (Admitted Pro Hac Vice)
                                        BAKER & DANIELS LLP

                                        Attorneys for Plaintiff Thomson, Inc.

-26-

| | |
|---|---|
| Dated: June 26, 2009 | By: _____/s/ Irfan A. Lateef_____ |

Craig S. Summers, SBN 108688
John W. Holcomb SBN 172121
Irfan A. Lateef, SBN 204004
Sean M. Murray, SBN 213655
Andrew J. Hall, SBN 246984
KNOBBE, MARTENS, OLSON & BEAR,
LLP

Attorneys for Defendants Toshiba America,
Inc. and Toshiba America Consumer Products,
L.L.C.

-27-

**ATTESTATION OF E-FILED SIGNATURE**

I, Brian M. Kramer, attest that all signatories listed above have read and approved the

CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT

MOTION OF NON-GUARDIAN PARTIES FOR SUMMARY JUDGMENT OF NON-

INFRINGEMENT OF UNITED STATES PATENT NO. 4,930,158 and consent to its filing in this

action.

Dated:    June 26, 2009           By:           /s/ Brian M. Kramer

                                                Brian M. Kramer, SBN 212107
                                                Vincent J. Belusko, SBN 100282
                                                Scott C. Moore, SBN 203181
                                                MORRISON & FOERSTER LLP

                                                Attorneys for Plaintiff Mitsubishi Digital
                                                Electronics America, Inc.

-28-