1  David P. Hall (CA #196891)
   Hugh A. McCabe (CA #131828)
2  Michael Ira Neil (CA #40057)
   Neil, Dymott, Frank, McFall & Trexler
3  1010 Second Avenue, Suite 2500
   San Diego, CA 98101
4  Telephone: (619) 238-1712
   Facsimile: (619) 238-1562
5  Email: dhall@neildymott.com
   Email: hmccabe@neildymott.com
6  Email: mneil@neildymott.com

7

8  Edward E. Casto, Jr. (*pro hac vice*)
   Barry J. Bumgardner (*pro hac vice*)
9  Steven W. Hartsell (*pro hac vice*)
   NELSON BUMGARDNER CASTO, P.C.
10 5601 Bridge Street, Suite 300
   Fort Worth, Texas 76112
11 Telephone: 817-377-9111
   Fax: 817-377-3485
12 ecasto@nbclaw.net
   barry@nbclaw.net
13 shartsell@nbclaw.net

14

15 **ATTORNEYS FOR GUARDIAN MEDIA
   TECHNOLOGIES, LTD.**

16          **UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF CALIFORNIA**
17

18 SONY ELECTRONICS INC.,                )   CIV. No. 05-CV-1777 IEG (AJB)
                                         )      (Consolidated Lead Case)
19          Plaintiff,                   )
                                         )
20 v.                                    )
                                         )   **GUARDIAN'S MEMORANDUM OF
21 GUARDIAN MEDIA TECHNOLOGIES,          )   POINTS AND AUTHORITIES IN
   LTD.,                                 )   OPPOSITION TO THE JOINT MOTION
22          Defendant.                   )   OF NON-GUARDIAN PARTIES FOR
                                         )   SUMMARY JUDGMENT OF NON-
23 ─────────────────────────────         )   INFRINGEMENT OF UNITED STATES
                                         )   PATENT NO. 4,930,158**
24 THOMSON INC.,                         )
                                         )   Date        October 23, 2009
25          Plaintiff,                   )   Time:       9:00 a.m.
                                         )   Judge:      Irma E. Gonzalez
26 v.                                    )   Trial Date: TBD
                                         )
27 GUARDIAN MEDIA TECHNOLOGIES,          )
   LTD.,                                 )
28          Defendant.                   )
                                         )   CIV. NO. 05-CV-1784 IEG (AJB)
   ─────────────────────────────         )      (Consolidated)

                                    i

| | | |
|---|---|---|
| 1 | PANASONIC CORPORATION and VICTOR COMPANY OF JAPAN, LTD., | ) ) |
| 2 | Plaintiff, | ) ) |
| | v. | ) |
| 3 | | ) |
| 4 | GUARDIAN MEDIA TECHNOLOGIES, LTD., | ) ) |
| 5 | Defendant. | ) ) |

CIV. NO. 05-CV-1796 IEG (AJB)
(Consolidated)

MITSUBISHI DIGITAL ELECTRONICS AMERICA, INC.,

Plaintiff,

v.

GUARDIAN MEDIA TECHNOLOGIES, LTD.,

Defendant.

CIV. NO. 05-CV-1780 IEG (AJB)
(Consolidated)

GUARDIAN MEDIA TECHNOLOGIES, LTD.,

Plaintiff,

v.

PHILIPS ELECTRONICS NORTH AM. CORP. and TOSHIBA AM. CONSUMER PRODS., L.L.C. and TOSHIBA AM., INC.,

Defendant.

CIV. NO. 08-CV-1859 IEG (AJB)

(Consolidated for Discovery)

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.  FACTUAL BACKGROUND ...................................................................................... 3

    A.  The '158 Patent ................................................................................................. 3

    B.  The value and applicability of the '158 patent is well established ............................... 3

    C.  The validity of the '158 patent has been confirmed multiple times ........................... 4

    D.  The accused devices play DVDs – they are not video game-only devices.................. 4

    E.  The Parties apparently agree that a representative sample is appropriate ................... 4

III. LEGAL STANDARDS ............................................................................................... 6

    A.  Summary Judgment Standard ........................................................................... 6

    B.  Claim Construction Principles ......................................................................... 7

    C.  Patent Infringement Standards ......................................................................... 8

IV.  ARGUMENTS AND AUTHORITIES ...................................................................... 9

    A.  The accused devices contain the "auxiliary device" recited in the claims ................. 9

        1.  The NG Parties' construction is incorrect ...................................................... 9

            a.  The "auxiliary device" in not limited to a physically separate" device 9

            b.  The "auxiliary device" is not required to be a "VCR." ........................ 11

            c.  Nothing requires that all of the steps of the claims be present inside or outside one black box .............................................................................. 11

        2.  Guardian's proposed claim construction should be adopted ........................... 11

        3.  The  accused products contain an "auxiliary device"...................................... 12

    B.  The accused devices cause playing of the program to be "suspended" as recited in the claims ............................................................................................................... 13

        1.  The accused devices suspend playing of the video program........................... 14

2. The accused devices do something entirely different to block an entire disc from playing ................................................................................................ 16

3. The NG Parties' arbitrary definitions must be rejected .................................. 16

C. The accused devices wait until a "resumption signal" is received before resuming a suspended program ............................................................................................ 17

1. The accused devices meet the "resumption signal " limitation ...................... 17

D. The accused devices "compare the detected code to a set of selected codes ............ 18

1. When requesting reexamination, the NG Parties construed "set" to mean "one or more" ............................................................................................................. 18

2. "Set" is properly construed as "one or more" under established principles of claim construction ............................................................................................ 19

3. The accused devices meet the "comparing the detected code to a set of selected codes" limitation ............................................................................... 19

V. DOCTRINE OF EQUIVALENTS ................................................................................. 22

1. At a minimum, the accused devices meet the auxiliary device" limitation under the doctrine of equivalents ................................................................................ 24

2. "Suspended" ................................................................................................. 24

3. "Resumption Signal" ..................................................................................... 24

4. "Set of Codes" .............................................................................................. 24

VI. CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

Cases

Allen Eng'g Corp. v. Bartell Indus., Inc.
299 F.3d 1336, 1344 (Fed. Cir. 2002) ................................................................ 9

Anderson v. Liberty Lobby, Inc.
477 U.S. 242, 248 (1986) ............................................................................... 6, 7

Ball Corp. v. Xidex Corp
967 F.2d 1440, 1447 (Tenth Cir. 1992) ............................................................ 19

Celotex Corp. v. Catrett
477 U.S. 317, 323 (1986) .................................................................................. 6

Dow Jones & Co. v. Ablaise, Ltd.,
Nos.06-1014, 06-1015, 2007 U.S. Dist. LEXIS 49750, at *12 (D.D.C. July 11, 2007) ... 19

Eastman Kodak Co. v. Goodyear Tire & Rubber Co.
114 F.3d 1547, 1552 (Fed. Cir. 1997) ................................................................ 8

Freedman Seating Co. v. Am. Seating Co.
420 F.3d 1350, 1353 (Fed. Cir. 2005) .............................................................. 23

Interactive Gift Express, Inc., v. Compuserve, Inc.
256 F.3d 1323, 1331 (Fed. Cir 2001) ............................................................. 7, 8

Irdeto Access, Inc. v. Echostar Satellite Corp.
383 F.3d 1295, 1299 (Fed. Cir. 2004) ................................................................ 9

Linear Tech. Corp. v. Impala Linear Corp.
379 F.3d 1311, 1318 (Fed. Cir. 2004) ................................................................ 8

Markman v. Westview Instruments, Inc.
517 U.S. 370, 384 (1996) .................................................................................. 9

Masson v. New Yorker Magazine
501 U.S. 496, 520 (1991) .................................................................................. 7

Moleculon Research Corp. v. CBS, Inc.
793 F.2d 1261, 1271 (Fed. Cir. 1986) .............................................................. 11

Moore U.S.A. v. Std. Register Co.
229 F.3d 1091, 1095-96 (Fed. Cir. 2000) ......................................................... 23

iii

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*
    415 F.3d 1335, 1348 (Fed. Cir. 2005) ...................................................... 11, 14, 17

*NTP, Inc. v. Research in Motion, Ltd.*
    418 F.3d 1282, 1293 (Fed. Cir. 2005) ................................................................ 8

*Phillips v. AWH Corp.*
    415 F.3d 1303, 1312, 1317 (Fed. Cir. 2005) ........................................... 7, 8, 11

*Power-One, Inc. v. Artesyn Techs., Inc.*
    No. 2:05-CV-463, 2007 U.S. Dist. LEXIS 20458, at *26-27 (E.D. Tex. Mar. 22, 2007). 19

*Riverwood Int'l Corp. v. RA. Jones & Co.*
    324 F.3d 1346, 1347 (Fed. Cir. 2003) ................................................................ 8

*Southwall Techs., Inc. v. Cardinal IG Co.*
    54 F.3d 1570, 1575 (Fed. Cir. 1995) .................................................................. 6

*Specialty Composites v. Cabot Corp.*
    845 F.2d 981, 987 (Fed. Cir. 1988) ................................................................... 7

*Sundance, Inc. v. Demonte Fabricating Ltd.*
    550 F.3d 1356, 1365 (Fed. Cir. 2008) ............................................................... 7

*Vitronics Corp. v. Conceptronic, Inc.*
    90 F.3d 1576, 1582-83 (Fed. Cir. 1996) ......................................................... 7, 8

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*
    520 U.S. 17, 40 (1997) ....................................................................................... 8


<u>Rules</u>

Fed. R. Civ. P. 56 ....................................................................................................... 6

Guardian Media Technologies, Ltd. ("Guardian") hereby submits this opposition to the Motion for Summary Judgment filed by the Non-Guardian Parties ("NG Parties").

## I.     INTRODUCTION

**The NG Parties are infringing the '158 patent.** The NG Parties cannot overcome the key facts of this case.

- They import and sell DVD players that play video recordings and have parental controls.

- These DVD players begin playing a program before taking any action based on the parental controls.

- The DVD Players suspend a program when the program rating exceeds preselected limits in the DVD Player.

- A suspended program is allowed to resume only after a recognized code (or PIN) is entered when prompted by an override message that is retrieved and played from memory in the DVD player. This memory device is not the DVD reader that retrieves the recorded program material from the DVD disc.

This is the functionality claimed in the '158 patent, and the NG Parties are liable for infringement.

**The asserted claims of the '158 patent are valid.** The NG Parties also cannot overcome the fact that they have taken their best shots to invalidate the '158 patent through *two* separate reexaminations filed with the Patent Office. When these reexaminations concluded, the Patent Office confirmed that the asserted claims are valid in their originally-issued form.

**The NG Parties try to overstate the findings of the central district.** Faced with these facts, the NG Parties are left with trying to manipulate a recent ruling from the Central District of California concerning a video game system offered by Nintendo. The NG Parties' reliance on this ruling is misplaced. The central district found only that the '158 patent does not cover parental control features related to <u>video game-only devices that do not play recorded DVDs.</u>

This ruling does not impact Guardian's infringement case concerning the accused devices in this case in any way, because the central district specifically based its ruling on its finding that the '158 patent covers devices that play "recorded movies, broadcast television programs, and cable television, regardless of the media on which they are recorded" as opposed to video

1    games.[1]  The NG Parties' accused devices all play "recorded movies, broadcast television
2    programs, and cable television" and allow the use of parental controls.

3         Perhaps even more importantly, the central district was presented with the opportunity to
4    decide the very claim elements raised by the NG Parties here: (1) auxiliary device; (2)
5    suspension; (3) resumption signal; and (4) comparing a detected code to a set of selected codes.[2]
6    In its opinion—an opinion that is not binding on this Court in any event—the central district
7    expressly refrained from reaching these claim elements in its summary judgment ruling,[3] and for
8    good reason.  The application of these claim elements to the accused device is, in itself, an issue
9    of fact to be decided by a jury.  As will be shown in detail below, these same issues of fact are
10   present, and should preclude the entry of summary judgment, in this case.

11        **The NG Parties attempt to minimize the relevant findings from Judge Brewster in**
12   **this case.**  Many of the NG Parties' arguments were recently presented to Judge Brewster in
13   opposition to Guardian's request to amend its counterclaims to allege the '158 patent.  In an
14   Order entered on January 5, 2009, Judge Brewster disagreed with the NG Parties and stated:
15   "Based upon the Court's review of the legal briefs, the supporting exhibits, and the proposed
16   construction of the claim terms, it does not appear that [the NG Parties] would 'inevitably' win a
17   summary judgment motion of non-infringement of the '158 patent."[4]

18        The NG Parties have now rehashed many of these same failed arguments with the
19   apparent hope that if they raise them enough times, they might finally work.  The NG Parties'
20   arguments were wrong before, and nothing has changed.  The NG Parties were not, and still are
21   not entitled to a summary adjudication of Guardian's infringement claims.

22        **The NG Parties rely on erroneous claim constructions and ignore immutable facts in**
23   **an attempt to persuade the Court.**  The NG Parties' motion assumes certain claim
24   constructions and the existence (or lack thereof) of certain facts to arrive at their conclusion of

---

[1] *See* Declaration of Steven W. Hartsell in Support of Guardian's Opposition to NG Parties' Motion for Summary Judgment ("Hartsell Decl."), Exh. 15 (Order & Tr. of Nintendo's Mot. for Summ. J.) at 4:6-7.

[2] Hartsell Decl., Exh. 13 (Nintendo's Mot. for Summ. J.) at 12.

[3] Hartsell Decl., Exh. 15 (Tr. of Nintendo's Mot. for Summ. J.) at 4 ("The Court will not rule on the construction of the other claims at this time.").

[4] Docket No. 146 at p. 6.

2

1  non-infringement. Yet, both the nature of the claim constructions proffered by the NG Parties
2  and the presence of undeniable facts regarding the operation of the "exemplary device" highlight
3  the futility of the NG Parties' positions.

4      With respect to the claim construction positions, the NG Parties attempt to improperly
5  restrict the *claims* of the invention to specific *embodiments* disclosed in the specification by
6  reading extra limitations into the claims. Moreover, the NG Parties have done an about-face with
7  respect to the constructions they advocated (and even accepted) during the reexaminations versus
8  the constructions they now propose. The NG Parties made representations with respect to a "set
9  of codes" and "auxiliary device" before the Patent Office in an attempt to increase their chances
10 of invalidating the '158 Patent claims. They should not be allowed to now argue different
11 constructions in an effort to avoid infringement.

12 **II.     FACTUAL BACKGROUND**

13 **A.     The '158 patent.**

14     United States Patent No. 4,930,158 ("the '158 patent") is entitled "Selective Video
15 Playing System."[5] The '158 patent was filed on August 29, 1988, and issued on May 29, 1990.
16 The '158 patent teaches and claims an invention for controlling the playing of objectionable
17 content in video programs such as recorded programs, movies, and the like. The invention allows
18 parents to prevent their children from viewing content that is not appropriate for them.

19     The invention disclosed in the '158 patent was well ahead of its time. Back in the late
20 1980s and early 90s, almost no televisions, VCRs or laser disc players could be programmed to
21 block objectionable content. Now, virtually every manufacturer of these devices, including the
22 NG Parties, incorporates the parental control teachings of the '158 patent into their products.

23 **B.     The value and applicability of the '158 patent is well established.**

24     Many other manufacturers recognize the value of the '158 patent and have taken a license
25 to it and United States Patent No. 4,930,160 (a related parental control patent by the same
26 inventor of the '158 patent). These licensees include some of the largest names in the industry.
27 All totaled, over 35 companies have entered into agreements with Guardian to lawfully use the

28

---

[5] Hartsell Decl., Exh. 1 ('158 Patent).

3

parental control inventions taught in its patents. The NG Parties are holdouts, but, as will be shown below, there is no doubt that they are infringing the claims of the '158 patent.

**C.  The validity of the '158 patent has been confirmed multiple times.**

The validity of the '158 patent has been confirmed in the face of repeated challenges by the NG Parties. In October 2005 and January 2007, Sony, Thomson, Matsushita (also known as Panasonic and JVC) and Mitsubishi asked the Patent Office to reexamine the '158 patent, claiming that it was invalid over numerous alleged prior art references. These reexamination proceedings concluded on November 4, 2008, with the Patent Office confirming the validity of claims 8-11 and 19-22.[6] The confirmed claims—the same claims at issue in this case—were found valid over the cited references *in their originally issued form*.[7] The '158 patent expired on August 29, 2008, but the NG Parties are still liable for their infringing acts committed during the period when the patent was still in force.

**D.  The accused devices play DVDs – they are not video game-only devices.**

The NG Parties rely heavily on the ruling in the central district as it relates to video game-only devices; that is, devices that do not play movies or other programs recorded on DVDs. This reliance is misplaced because each of the accused devices in this case plays DVDs of this nature.

**E.  The Parties apparently agree that a representative sample is appropriate.**

In its Preliminary Infringement Contentions, Guardian identified the accused instruments as "DVD Players imported and sold by [the NG Parties] during the relevant period that include parental control features allowing viewers to block the display of objectionable content."[8] Guardian further alleged that the accused instruments included "other products (such as, but not limited to, game players/consoles [that play DVDs], DVRs, computers or computer drives) having the capability to block the playing of DVDs or other recorded programming based on program ratings. Such other products would infringe the asserted claims of the '158 patent in the same manner as discussed in the [representative claim charts]."[9]  Guardian included

---

[6] Hartsell Decl., Exh. 2 ('158 Reexamination Certificate).

[7] *Id.*

[8] *Id.*

[9] *Id.* at p. 5.

4

1  representative claim charts concerning the Sony Model No. DVP-NS400D showing how these

2  accused instruments infringed the '158 patent.[10]  After Guardian obtained the specific model

3  number of the devices sold during the relevant damages period through discovery, Guardian

4  identified them in supplemental disclosures.

5      In the instant Motion for Summary Judgment, the NG Parties did the same.  They

6  identified the Sony Model No. DVP-NS400D as an "exemplar" product for analyzing the

7  infringement issues in this case.[11]  Guardian agrees that identifying such an "exemplar device"

8  should be used to reduce the burden on the parties and the Court, and will direct its opposition to

9  this player.

10      Going forward, the Court should be wary of any attempt by the NG Parties to

11  conveniently lessen their own burden of proving non-infringement (they are the plaintiffs) while

12  unreasonably increasing Guardian's burden on the same issue.  Either the identified exemplary

13  product is applicable to all issues in this case (including Guardian's infringement case), or the

14  NG Parties should not be allowed to rely on exemplary product(s) when it suits their motion for

15  summary judgment.

16      With respect to the statements by Guardian regarding the similar operation of all of the

17  accused products, the NG Parties stated:

18      [I]n view of the large number of products listed in the Supplemental Disclosure,
     it appears that those statements are little more than unsubstantiated short cuts
19      taken in an effort to feign compliance with Patent L.R. 3.1.c and 3.1.d. But
     Guardian has in no way demonstrated the propriety of the positions that those
20      statements represent protested that the infringement contentions were somehow
     insufficient because there was not a separate claim chart for each and every
21      accused device.[12]

22

23

_____

[10] *Id.* (noting that "each of the Non-Guardian Partis' accused products operate in the *same material way with respect
24  to Guardian's infringement analysis,* and these   claim charts are *representative* of Guardian's infringement
contentions against all of the Non-Guardian Parties' products.") (emphasis added).

25  [11] Docket No. 44-2, Memorandum of Points and Authorities in Support of Joint Motion of Non-Guardian Parties for
Summary Judgment of Non-Infringement of United States Patent No. 4,930,158(hereinafter "NG Parties MSJ"), p.
26  10 ("*The manner in which all of the charted players operate, for the purposes of this motion, is undisputed, and is
illustrated here* with specific reference to the Sony accused stand-alone DVD player, model VPNS400D…")
27  (emphasis added).

28

[12] Hartsell Declaration, Exh. 10 (Letter from Daniel Lechleiter to Steven Hartsell, June 10, 2009).

*Yet, it was the NG Parties who initiated this suit* by making broad claims of non-infringement for their "televisions and DVD players," without specifying a single model in their complaint. The Court should end this gamesmanship now and find that the products identified by the NG Parties in their motion are exemplary for all infringement issues in this case. Otherwise, the Court should deny the NG Parties' summary judgment motion on the ground that they have not established non-infringement of every "DVD Player[] imported and sold...that include[s] parental control features..." they have sold over the relevant period.[13] At a minimum, Guardian requests that the Court find that the NG Parties' attempt to use an "exemplary device" is an admission that all accused devices operate in the same manner as the Sony DVP-NS400D.

Guardian does not dispute the test results offered by the NG Parties on the exemplary Sony product. Yet, as shown in the NG Parties' own testing, the exemplary product employs the invention claimed by the '158 patent. This will be analyzed in detail in the arguments below.

## III.   LEGAL STANDARDS

### A.    Summary Judgment Standard

Summary judgment is inappropriate, unless the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the nonmoving party. *Id.* The party moving for summary judgment bears the burden of identifying the portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the nonmoving party need only "set forth specific facts showing that there is a genuine issue for trial" to defeat the motion and have its day in court. Fed. R. Civ. P. 56(e). The court may not make credibility determinations, and

---

[13] The NG Parties, (except for Toshiba) started this case by filing declaratory judgment actions for a finding of non-infringement *as to their televisions and DVD players.* As a result, they have the burden of proving non-infringement for every one of their products, which include literally thousands of devices.

1 inferences to be drawn from the facts must be viewed in the light most favorable to the

2 nonmoving party. *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991); *Anderson*, 477

3 U.S. at 249. A summary adjudication is appropriate only "when viewing the evidence in a light

4 most favorable to the non-moving party–giving that party the benefit of all reasonable

5 inferences–there is no genuine issue of material fact for the jury, and reasonable minds could

6 come to but one conclusion in favor of the moving party." *Sundance, Inc. v. Demonte*

7 *Fabricating Ltd.*, 550 F.3d 1356, 1365 (Fed. Cir. 2008).

8 **B.      Claim Construction Principles**

9         The claims of a patent define its scope. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

10 (Fed. Cir. 2005). Claims are to be construed according to their ordinary custom and meaning as

11 understood by "a person of ordinary skill in the art in question at the time of the invention."

12 *Phillips*, 415 F.3d at 1312. A deviation from the ordinary meaning of terms is justified, however,

13 if the patentee chose to act as his own lexicographer or if the patentee has relinquished a potential

14 claim construction in an amendment to the patent or in an argument to overcome or distinguish a

15 reference. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

16         In construing patent claims, the court looks first to the intrinsic evidence, which includes

17 the language of the claims themselves, the specification of the patent, and, if in evidence, the

18 prosecution history because "it is that language that the patentee chose to use to 'particularly

19 point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'"

20 *Interactive Gift Express, Inc., v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir 2001) (quoting

21 35 U.S.C. § 112). However, it is often error to limit the language of a claim to specific

22 embodiments disclosed in the specification, even if only a single embodiment is disclosed.

23 *Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments

24 of the invention, we have repeatedly warned against confining the claims to those

25 embodiments...In particular, we have *expressly rejected* the contention that if a patent describes

26 only a single embodiment, the claims of the patent must be construed as being limited to that

27 embodiment."). Simply put, it is error to read extraneous limitations into the claims. *Specialty*

28 *Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) ("Where a specification does not

*require* a limitation, that limitation should not be read from the specification into the claims." (emphasis in original)).

All intrinsic evidence is not equal. *Vitronics*, 90 F.3d at 1582. The language of the claims is the first place a court must look in construing patent claims. *Riverwood Int'l Corp. v. RA. Jones & Co.*, 324 F.3d 1346, 1347 (Fed. Cir. 2003). Where the claim language is unclear, the court may then look to the specification and patent prosecution history to help ascertain the meaning of the claims. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005); *see also Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997) (stating that "a construing court does not accord the specification, prosecution history, and other relevant evidence the same weight as the claims themselves, but consults these sources to give the necessary context to the claim language.").

If, after reviewing all of the intrinsic evidence, the proper construction of the claims is still ambiguous, the court may consider extrinsic evidence. *Phillips*, 415 F.3d at 1317. Extrinsic evidence consists of all evidence external to the patent and file history, including dictionaries, expert testimony, and learned treatises. *Id.* The Court looks to extrinsic evidence "only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Interactive Gift Express*, 256 F.3d at 1332.

## C.    Patent Infringement Standards

Patent infringement may be proven by showing literal infringement of every limitation recited in a claim or by showing infringement under the doctrine of equivalents. *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1318 (Fed. Cir. 2004). Both literal infringement and infringement under the doctrine of equivalents require an element-by-element comparison of the patented invention to the accused device. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). When the patented invention is being compared to the accused device under the doctrine of equivalents, the court should consider "whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.*

1   Determination of patent infringement is a two step process.  First, the Court must

2   determine, as a matter of law, the meaning of the particular patent claim or claims at issue.

3   Second, the fact finder must consider whether the accused product infringes one or more of the

4   properly construed claims.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996);

5   *see also Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1344 (Fed. Cir. 2002).  The

6   second inquiry is a question of fact and summary judgment on the issue of infringement is

7   improper unless there is no genuine dispute concerning the material facts.  *Irdeto Access, Inc. v.*

8   *Echostar Satellite Corp.*, 383 F.3d 1295, 1299 (Fed. Cir. 2004).

9                          **IV.    ARGUMENTS AND AUTHORITIES**

10      The NG Parties argue that their accused devices do not infringe the following claim

11  limitations:

12      a.    Auxiliary device;
        b.    Suspension;

13      c.    Resumption signal; and
        d.    Comparing a detected code to a set of selected codes.

14      All of these limitations appear in the relevant independent claims of the '158 patent

15  (claims 8 and 19).  As shown below, the NG Parties' motion must be denied, because their

16  accused devices infringe each of these disputed claim limitations.

17  **A.    The accused devices contain the "auxiliary device" recited in the claims.**

18      **1.    The NG Parties' construction is incorrect.**

19      The NG Parties incorrectly argue that the construction of "auxiliary device" should be "a

20  playback device, such as another VCR, that is physically separate from the device that plays back

21  the main video program."[14]  This proposed construction should be rejected for several reasons.

22      **a. The "auxiliary device" is not limited to a "physically separate" device.**

23      The NG Parties' construction of this term conforms to an <u>incorrect</u> construction initially

24  adopted during reexamination.[15]   However, the Patent Office subsequently <u>corrected</u> this

25  construction in a subsequent Office Action dated May 19, 2006: "The prior Office action has

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [14] NG Parties Brief at p. 17.

28  [15] Hartsell Decl., Exh. 4 (Office Action mailed March 23, 2006) at 14; *see also* NG Parties Brief at p. 17 (referring to
    Office Action dated March 23, 2006).

                                        9

been *corrected for inconsistencies* that were discovered upon review."[16]   As part of these corrections, the Examiner deleted the proposed construction proffered by NG Parties.   It was replaced with the following:

> The examiner maintains that this 'auxiliary device' recitation reads on the 'auxiliary source' of <u>substitute</u> video programming....[17]

The Patent Office adopted this construction in response to additional arguments *made by the NG Parties*.  Specifically, the NG Parties urged that: "To the extent that 'auxiliary device' is construed *more broadly than a physically separate* playback device, Claim 7 is also anticipated by Chard [an alleged prior art reference]."[18]   By this statement, the NG Parties clearly <u>acknowledged that a construction of auxiliary device that did not require physical separation was reasonable, if not appropriate</u> by offering an allegedly invalidating reference (Chard) based on this construction.  The Patent Office went on to adopt this construction for "auxiliary device" by finding that "Chard includes [an] "auxiliary" image generating device...."[19]  This component in the Chard reference was not physically separate from the disclosed system[20]—clearly, then, the Patent Office construed "auxiliary device" to include sources of substitute material that were not physically separated from the player of the video program.   The NG Parties attempted to capitalize on this construction by arguing that Chard met the "auxiliary device" limitation.[21]

Now, however, when the infringement of their accused devices is at issue, the NG Parties want to disavow their acknowledgment before the Patent Office and narrow the construction of this claim limitation as much as possible in an attempt to avoid infringement.  The NG Parties should not be allowed to reverse course now, after failing not once, but twice to invalidate the claims at issue in the Patent Office through reexamination.  The Patent Office gave this term a broad construction in response to the NG Parties' arguments in the reexaminations, and the same

---

[16] Hartsell Decl., Exh. 5 (Office Action mailed May 19, 2006) at p. 2 (emphasis added).

[17] *Id.* at 15 (emphasis added).

[18] Hartsell Decl., Exh. 16 (Ex Parte Request for Reexamination) at 14-16 (emphasis added).

[19] Hartsell Decl., Exh. 5 (Office Action mailed May 19, 2006) at 7.

[20] Hartsell Decl., Exh. 18 (U.S. Patent No. 4,605,964, at Fig. 3) (depicting the "Message Display Control 48").

[21] *Id.*

1 construction should apply equally here. The "auxiliary device" limitation should not be
2 construed to require a "physically separate" device.

### b. The "auxiliary device" is not required to be a "VCR."

4 Nor should "auxiliary device" be limited to a VCR as argued by the NG Parties for the
5 same reasons stated above. The Patent Office specifically found that the auxiliary device was not
6 restricted to a VCR.

7 Furthermore, "[i]n some cases, the ordinary meaning of claim language as understood by
8 a person of skill in the art may be readily apparent even to lay judges, and claim construction in
9 such cases involves little more than the application of the widely accepted meaning of commonly
10 understood words." *Phillips v. AWH Corp.*, 415 Fed. Cir. 1303, 1314 (Fed. Cir. 2005). The term
11 "device" is a term that follows this rule. Clearly, a "player" is a type of "device," but every
12 device is not a player. "[U]nless required by the specification, limitations that do not otherwise
13 appear in the claims should not be imported into the claims." *N. Am. Container, Inc. v. Plastipak*
14 *Packaging, Inc.*, 415 F.3d 1335, 1348 (Fed. Cir. 2005). There is simply nothing in the
15 specification or the claims that requires the "auxiliary device" to be restricted to a VCR.

### c. Nothing requires that all of the steps of the claims be present inside or outside one black box.

18 Though certainly some type of "player" plays the video recording, neither the claims nor
19 the specification require that everything be located inside *or* outside of one enclosure or that the
20 source be a VCR. When a step in a method claim recites a structure for performing a step, that
21 structure *may* limit the claim. *See Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271
22 (Fed. Cir. 1986) (noting decisions where a structural recitation in a method claim step was
23 construed as a limitation). However, "[w]hether structural recitation limits a claim depends on
24 the language of the claim, the specification, prosecution history, and other claims." *Id.*

25 The asserted claims disclose the term "auxiliary device." Nothing in the claim, the
26 specification, or the prosecution history requires that the "auxiliary device" be a VCR or
27 "physically separate," much less both. Both "VCR" and "physically separate" represent attempts
28 to improperly import limitations into the claims. *N. Am. Container*, 415 F.3d at 1348.

### 2. Guardian's proposed construction should be adopted.

Guardian proposes that the term "auxiliary device" should be construed to mean "a substitute source of video material, where such material may include messages, information, advertisements, or other video programs." This construction espouses the explicit teachings of the patent specification, but does not improperly confine the definition to specific embodiments in the specification, as the NG Parties advocate. It is consistent with the findings of the Patent Office set forth above, and does not impermissibly limit the construction to specific embodiments, as the NG Parties attempt.

According to the specification, the "auxiliary device" provides substitute material to replace material from a main program that has objectionable content:

> If a REPLACE code is detected, a signal is sent to auxiliary output 11. On receipt of this signal, an auxiliary device...responds by playing another recording, and an auxiliary switching device selects the substitute material to be displayed instead of the signal from replay signal output.[22]
>
>        \*     \*     \*
>
> When the auxiliary device has finished replaying the substitute program, it sends a signal to auxiliary input 12, which is received by microcomputer 6 which causes replay of the first program to resume.[23]

The specification goes on to specifically teach that this substitute material may include "*information,*" "*advertisements,*" "*messages,*" or substitute "programs."[24] Nowhere in the specification or the claims does it require that the auxiliary device be "physically separate" or limited to a "VCR" as now conveniently argued by the NG Parties.

Nor does the word auxiliary "player" appear in the specification or the claims. The patentee used specific language to denote the source of auxiliary content—"device." Guardian's proposed construction is consistent with the specification and prosecution history of the '158 patent and the two reexaminations at the Patent Office, it recognizes the distinction between "player" and "device," and it should be adopted by the Court.

### 3. The accused products contain an "auxiliary device."

---

[22] Hartsell Decl., Exh. 1 ('158 Patent) at Col. 5:25-31 (emphasis added).

[23] Hartsell Decl., Exh. 1 ('158 Patent) at Col. 5:38-41 (emphasis added); *see also* 5:49-51.

[24] Hartsell Decl., Exh. 1 ('158 Patent) at Col. 5:39, 48, 50-51.

When a DVD recording is suspended because it exceeds the parental control settings in the accused products, a parental control warning and override message is displayed:[25]



This *message* is generated from "flash" or "one time programmable (OTP)" memory installed in the accused devices.[26] As shown in the referenced exhibits, this memory is separate from the DVD reader that reads and plays the recorded program from the DVD,[27] and it is the "auxiliary device" or "substitute source of video material" taught in the patent claims.

Thus, even if the Court were to find that the "auxiliary device" must be physically separate from the DVD reader, the accused devices would still infringe because the main video programming contained on the DVD itself—and read by the DVD reader—is separate from this memory, which is the source of the override *message*.

**B.      The accused devices cause playing of the program to be "suspended" as recited in the claims.**

The meaning of this term was determined by the Examiner during the reexaminations. As found by the Examiner, "suspended" means "a holding, pausing, temporarily stopping or deferring until a predetermined time period [or][28] type of action, i.e. the video program is present but is not continuing to replay because it is temporarily stopped or held."[29] There is no reason to

---



[25] *See* Hartsell Decl., ¶ 20.

[26] Hartsell Decl., Exh. 11 (Ferraro Decl.) at ¶¶ 16, 17, 26, 77-79.

[27] Hartsell Decl., ¶¶ 70-71, Exh. 11 (Ferraro Decl.) at ¶ 73-81, Exh. 19 (SEL2035242).

[28] Guardian believes that the examiner mistakenly left out the conjunction "or" in the Notice of Intent to Issue a Reexamination Certificate.

[29] Hartsell Decl., Exh. 9 (Notice of Intent to Issue Reexamination Certificate) at 7; *see also* Exh. 1 ('158 Patent) at Col. 5:7-14.

13

1 stray from this meaning. The real disagreement among the parties is the application of this term
2 to the accused products. This application, however, is an issue of fact—not an issue of law—and
3 this alone should result in summary judgment being denied on this claim limitation. *See N. Am.*
4 *Container,* 415 F.3d at 1344. In any event, there is no doubt that the accused devices are
5 infringing this claim limitation because the exemplar player suspends play as recited in the
6 claims.

7 **1. The accused devices "suspend" playing of the video program.**

8 The exemplary Sony device begins playing before displaying the prompt screen that
9 allows a user to override the parental controls. After a *Star Wars II – Attack of the Clones* DVD
10 is inserted into the accused devices, the disc begins spinning, and the accused devices begin
11 playing content from the disc and displaying it on the television screen.[30]

### Figure 14 (Parental Control On)



21 This figure from the NG Parties own brief[31] shows that video images are being displayed from
22 the DVD recording. There can be no question that the recorded program is playing at this point.

23 Furthermore, a "play" arrow is displayed on the player screen for a period of time while
24 the screen from the NG Parties' Fig. 14 is displayed.[32]

25

26

27 [30] Hartsell Decl. at ¶¶ 14, 22.

28 [31] Memorandum of Points and Authorities in Support of Joint Motion of Non-Guardian Parties for Summary
Judgment of Non-Infringement of United States Patent No. 4,930,158, Docket No. 182-2, at 13, Fig. 14.

[32] Hartsell Decl., ¶ 18.

When the "play" arrow is no longer displayed, a "pause" icon is present.[33] This "pause" indicates that the program is "suspended," and is completely consistent with the construction used by the examiner in upholding the validity of the claims.

The playing of other DVDs further illustrates the playing and suspending operation. For instance, upon inserting a *Species II* DVD in the exemplary Sony device, an initial menu is presented with animation and audio.[34] This menu is displayed regardless of the parental control settings.[35] From the first menu, a second menu can be selected for display. It is only after selecting certain items from the second menu that the program is suspended and a parental control screen appears.[36]

This type of operation renders moot all of the NG Parties' arguments with respect to the playing/suspend claim limitations not being found in the exemplary Sony device. For example, the NG Parties claim that the parental control screen from the *Star Wars II* DVD is not part of the video program because it is not displayed in certain circumstances; however, the "20th Century Fox" screen that is shown originates from the DVD. So, while the NG Parties claims concerning the *Star Wars II* DVD is not true, this argument certainly does not apply to other DVD recordings, such as the *Species II* DVD because regardless of the parental control settings, video content and several menus are presented before the exemplar device suspends playback.[37]

---

[33] *Id.* ¶ 19.

[34] Hartsell Decl, Exh. 11 (Ferraro Decl. at ¶¶ 62-64).

[35] *Id.* (Ferraro Decl. at ¶ 66).

[36] *Id.* (Ferraro Decl. at ¶¶ 65-66).

[37] Additionally, to the extent that the NG Parties would argue that the *Species II* DVD is not "playing" before calling the parental control screen, Guardian submits that the exemplar player itself refutes such a claim. If a user tries to merely access the parental control settings from any of the menu screens, the user is instructed to "Stop playback and retry after operation." Thus, the NG Parties' own "exemplary player" shows that the DVD is "playing" before you can access the parental control system.

## 2. The accused devices do something entirely different to block an entire disc from playing.

When an entire disc is set to be blocked by an authorized user of the player, *no content is displayed before the user is prompted to enter an authorization code to access the disc.*



In the figure above, the same DVD was used as an example. When the DVD player was set to entirely block the *Star Wars II – Attack of the Clones* DVD, the exemplar device never showed a "play" icon or a "pause" icon.[38] Before any video content was displayed whatsoever, the viewer was informed that the "custom parental control is already set."[39] No video content was played or suspended, and no "play" or "pause" icons were displayed. This example demonstrates that in the case of a parental 'lock' for a specific disk, nothing is played; whereas, when parental controls based on ratings are utilized, the exemplary player "plays" content, and then "suspends" play to prompt the user for an override PIN as recited in the claims of the '158 patent.

## 3. The NG Parties' arbitrary definitions must be rejected.

The NG Parties are arbitrarily and selectively defining what they consider to be the starting point of the program. The NG Parties' approach, however, is belied by the fact that the image shown above from the *Star Wars II – Attack of the Clones* and *Species II* DVDs are every bit a part of the recorded programs as any other scene or image, and it illustrates why the NG Parties are wrong on this claim limitation. Even the DVD player displays the "play" arrow and

---

[38] Hartsell Decl. at ¶¶ 32-33.

[39] *Id.*

1    the "play clock" begins to tick before the program is suspended. All of the program data,

2    including the played images and others, are read and played from the DVD.[40] They are all part of

3    the program recorded on the DVD.[41]

4         The NG Parties admit that content from the DVD is played before the user is prompted to

5    override the parental controls.[42] After the DVD has started playing, the program is suspended if

6    the accused device determines that the program rating exceeds the ratings set in the device. This

7    meets the "suspended" limitation recited in the claims of the '158 patent. At a minimum, it

8    should be left for a jury to decide the key fact of whether the video images from the DVD

9    program displayed on the screen (and shown above) are part of the "program" as recited in the

10   '158 patent. Summary judgment is not appropriate to resolve this material issue of fact.

11   **C.    The accused devices wait until a "resumption signal" is received before resuming a
12        suspended program.**

         The meaning of "resumption signal" was determined during the reexaminations. As

13   found by the Examiner, a "resumption signal" is "a generated affirmative signal that causes

14   playing of the suspended program to resume."[43] The parties also disagree on the application of

15   this term to the accused devices, and this is an issue of fact that precludes summary judgment on

16   this claim limitation. *See N. Am. Container*, 415 F.3d at 1344.

17   **1.    The accused devices meet the "resumption signal" limitation.**

18        The NG Parties claim that entering a PIN does not constitute a "resumption signal"

19   because the program does not start until after a PIN is entered.[44] This is essentially the same

20   argument the NG Parties present with respect to the "suspended" limitation, which is addressed

21   above. To repeat what was stated there, NG Parties can only make this argument by giving an

22   arbitrary and self-serving interpretation as to when playing occurs. A more reasoned view,

23   however, is that the recorded program is suspended after it has started playing, and it will resume

24

25   ────────────

[40] *Id.* ¶¶ 14 - 18.

26   [41] Harstell Decl. ¶ 11 (Ferraro Decl. at ¶ 11).

27   [42] *See* Section III.A.2, *supra* (discussing the NG Parties' admission that the parental control prompt screen is content
contained on the DVD).

28   [43] Hartsell Decl., Exh. 9 (Notice of Intent to Issue a Reexamination Certificate) at p. 4.

[44] NG Parties Brief at p. 16.

1 playing only after a correct PIN is entered. A resumption signal is received by the accused

2 devices when the correct PIN is entered.[45] At a minimum, it should be left for a jury to decide

3 the factual issue of whether the image shown above is part of a "video program" as recited in the

4 '158 patent. Summary judgment is not appropriate to resolve this material issue of fact.

5 **D.     The accused devices "compare the detected code to a set of selected codes."**

6     **1.  When requesting reexamination, the NG Parties construed "set" to mean
7         "one or more."**

8         A "set" of codes is "one or more" codes. This is the definition that the NG Parties offered

9 to the Patent Office in an effort to instigate the reexaminations, and the Patent Office adopted. In

10 their brief, however, the NG Parties have now completely reversed course, and argue that: "The

11 language is clearly set forth as requiring the received code to be compared to _plural_ codes—a _set_

12 of _codes_ means exactly what it says."[46] The NG Parties offer no additional support for this new

13 construction beyond this conclusory statement.

14         The NG Parties are wrong for many reasons. Most importantly, their latest construction is

15 diametrically opposed to what they argued in the Patent Office and the Patent Office's findings.

16 In those arguments, the NG Parties claimed that a reference involving "one or more" codes met

17 the "set of classification codes" limitation in the '158 patent:

18         Chard allows a user to select one or more ratings levels that will be blocked, for
        both video and audio, thereby 'enabling selection of a set of classification codes'
19         as required by Claim 1 of the '158 patent.[47]

20
21 The NG Parties applied this same argument to Claims 8 and 19.[48] The Patent Office agreed with

22 the NG Parties and found that when a _user selects "one or more ratings levels,"_ a set has been

23 selected.[49]

24         This about-face is particularly troubling. The NG Parties cannot have it both ways. If

25 they truly believe that the language is "exactly plural" as argued in their brief, then they cannot

---

26 [45] Hartsell Decl., Exh. 11 (Ferraro Decl.) at ¶¶ 19, 95-96.

27 [46] NG Parties' MSJ, Docket No. 182-2, at. 22.

[47] Hartsell Decl., Exh. 16 (Request for Ex Parte Reexamination) at 12.

28 [48] _Id._ at 15. These are the independent claims asserted in this case.

[49] _Id._ at 5, 12.

escape the fact that they made false representations to the Patent Office. This lack of candor should result in an exceptional case finding against the NG Parties. *See Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1447 (Tenth Cir. 1992) ("We hold that the duty of candor and good faith in the reexamination proceeding applies to both the requester and the patent defender, as well as to their respective attorneys and agents.").

### 2. "Set" is properly construed as "one or more" under established principles of claim construction.

Nowhere in the specification is "set" defined as "two or more." In fact, the term "set" is not explicitly defined in the claims or the specification, so it is appropriate to consult extrinsic sources, such as dictionaries and experts. The '158 patent involves computer-related methods and devices, so mathematical definitions should be applied. Dictionaries and textbooks confirm that a "set" may contain "one given element"[50] or "a collection of objects or elements classed together."[51] Additionally, one of ordinary skill in the art would recognize a set of codes to include one or more codes.[52] Since a set may contain one or more elements, Guardian's proposed construction should be adopted.

This is further confirmed by the findings of other courts, which have concluded that the term "set" should mean "one or more." *See Dow Jones & Co. v. Ablaise, Ltd.*, Nos.06-1014, 06-1015, 2007 U.S. Dist. LEXIS 49750, at *12 (D.D.C. July 11, 2007) ("'Set' has a plain meaning of 'one or more.'"); *see also Power-One, Inc. v. Artesyn Techs., Inc.*, No. 2:05-CV-463, 2007 U.S. Dist. LEXIS 20458, at *26-27 (E.D. Tex. Mar. 22, 2007). Clearly, "set" as used in claims 8 and 19 means "one or more."

### 3. The accused devices meet the "comparing the detected code to a set of selected codes" limitation.

There is no dispute that the accused devices compare a detected MPAA rating code from a DVD to preselected codes within the DVD player. Thus, there is no dispute that the accused devices infringe this properly construed limitation.

---

[50] Hartsell Decl., Exh. 7 (Webster's Dictionary) at 1785, ("singleton," no. 3).

[51] *Id.* at 1752, ("set," no. 109).

[52] Hartsell Decl., Exh. 11 (Ferraro Decl.) at ¶ 99.

1    Yet, even if the NG Parties' construction is applied (i.e., that "set" means "two or more"),

2    the accused devices still infringe. The accused devices are pre-programmed from the factory to

3    recognize and process the various rating codes – from "1" through "8."[53] A user sets these codes

4    by accessing the "Custom Parental Control" feature of the exemplar device. By accessing the

5    same "Custom Parental Control" feature, the user can also set *a country code*.[54] This country

6    code is separate and distinct from the regional setting that determines whether a DVD destined

7    for an Asian DVD player, for example, can play on a United States DVD player. Instead, this

8    country code is used exclusively in the parental control system of the exemplary product.

9    In the exemplar device, the rating codes are set under the heading "LEVEL," and the

10   country codes are set under the heading "STANDARD." If the country code is set to "USA," the

11   user sees MPAA ratings assigned to the various levels.[55]



19   If the user sets an alternative country code (provided in the product manual), the rating

20   codes do not include the MPAA ratings in addition to the level number. In the example below,

21   the user selected the code for the United Kingdom, which is 2184 according to the exemplar

22   device's operating manual.[56]

---

[53] Hartsell Decl., Exh. 17 (Sony Stipulation ¶ 3); Exh. 11 (Ferraro Decl.) at ¶ 38.

[54] Hartsell Decl., Exh. 17 (Sony Stipulation ¶ 2).

[55] Hartsell Decl. ¶¶ 10-12; Exh. 11 (Ferraro Decl at ¶ 38).

[56] Hartsell Decl. ¶¶ 42-44; Exh. 3 (Sony DVP-NS400D Operating Manual at 63); Exh. 11 (Ferraro Decl. at ¶¶ 55-60).

Area Code

| Standard | Code number | Standard | Code number |
|---|---|---|---|
| Argentina | 2944 | Korea | 2388 |
| Australia | 3047 | Malaysia | 3946 |
| Austria | 7968 | Mexico | 3065 |
| Belgium | 3937 | Netherlands | 3545 |
| Brazil | 3076 | New Zealand | 2690 |
| Canada | 7579 | Norway | 2279 |
| Chile | 2099 | Pakistan | 3437 |
| China | 7577 | Philippines | 3473 |
| Denmark | 2114 | Portugal | 3746 |
| Finland | 2165 | Korea | (illegible) |
| France | 2175 | Singapore | 7798 |
| Germany | 2759 | Spain | 2740 |
| Hong Kong | 2275 | Sweden | 7608 |
| India | 3348 | Switzerland | 2689 |
| Indonesia | 2118 | Taiwan | 2546 |
| Italy | 2154 | Thailand | 3578 |
| Japan | 7775 | United Kingdom | 2184 |

United Kingdom    2184

Guardian's testing and review of the source code for the exemplary Sony device confirm that both the county code and the parental level code are compared to codes retrieved from DVDs in determining whether to activate the parental controls of the device. For example, Guardian set the exemplary device to parental control level 3 (which corresponds with the MPAA rating of "PG") with a country code of "USA" and then attempted to play certain scenes from the *Species II* DVD, which is rated "R".[57] The playback of the DVD was suspended and a parental control screen appeared that required the user to enter an override PIN to continue.

Guardian then left the parental control level at 1, but changed the country code to the United Kingdom's code – 2184. Guardian also attempted to play the same scenes that were suspended when the country code was set to USA. When the UK country code was used in place of the USA country code, the exemplar player played the scenes without prompting the user for an override PIN. This type of operation demonstrates that both the country code and the parental control code are used by the exemplary device in determining whether to suspend the playback of a DVD.[58] Thus, even if the NG Parties' construction of "set of codes" is adopted, Guardian has demonstrated that the exemplary Sony device compares two user selected codes—country code and rating code—to codes retrieved from the DVD in its parental control operations.

Still further, an examination of the source code for the exemplary Sony device showed that selecting a single parental control level from the screen shown above results in the comparison of a multi-bit field to a value retrieved from a DVD. Sony stipulated that the device

---

[57] Hartsell Decl. ¶ 11 (Ferraro Decl. at ¶ 60).

[58] *See also* Hartsell Decl. ¶ 17 (Sony Stipulation at ¶ 7 ("When a user sets the parental control level of the Player to a certain level and the DVD contains the table corresponding to the Player's *country code setting*, the Player accesses the entry in the table on the DVD disc that corresponds to the user-set level….").

1   operates in this manner.[59]  This multiple-bit bit field is yet another example of two or more user

2   selected codes being compared to a code detected from the DVD.

3          When the user selects a parental control level of "G", "PG", etc., that value must be

4   translated by the exemplary Sony device before it can be compared to the MPAA rating of a

5   DVD.  This comparison is not nearly as simple as one might assume.  Rather, the user-selected

6   parental control level is stored in the exemplary Sony device as a value between 1 and 8.[60]  Once

7   stored in this format, the value is then translated into a 16 bit bit-field as a series of 16 contiguous

8   1s and 0s.[61]  It is this bit field, not the letters "G", "PG", etc., or the numbers between 1 and 8, that

9   is actually compared by the exemplary Sony device to a value stored on a DVD in determining

10  whether to suspend the playback of a DVD and prompt a user for an override PIN.[62]

11         This manner of operation is very similar to what is disclosed in the '158 patent.  For

12  instance, in col. 4, lines 11-22, the '158 patent discloses the use of a bit-field to implement a

13  parental control system.  Given that both the exemplary Sony device and the invention described

14  in the '158 patent use a multi-bit bit-field to implement their respect parental control systems, the

15  NG Parties unsupported statement that "the accused players do not have any ability to compare a

16  received code to a set of codes" should be rejected.[63]

17                          V.     **Doctrine of Equivalents**

18         The doctrine of equivalents applies, *inter alia*, to each of the claim limitations discussed

19  in the NG Parties' brief.  The NG Parties go to great lengths to persuade the Court that the

20  doctrine of equivalents is not available as an infringement theory to the NG Parties because

21  application of the doctrine to the claim terms at issue would be directly contrary to those

22  _____

23  [59] As the Court is aware, Guardian requested the ability to depose a Sony representative to confirm Guardian's
    understanding of the source code. Sony was willing to stipulate to the relevant facts, which obviated the need for the
24  deposition.

    [60] Hartsell Decl., Exh. 17 (Sony Stipulation at ¶ 3).
25
    [61] *Id.* (Sony Stipulation at ¶ 7).
26
    [62] *Id.* (Sony Stipulation at ¶¶ 8-11)
27
    [63] Sony, Panasonic, Mitsubishi, and Thomson are four of the ten founding members of the DVD Forum, a group
28  which is responsible for the DVD format specification. The DVD format specification requires the use of a bit-field
    in the implement the DVD's parental controls.  Upon information and belief, these parties collect substantial
    royalties from other DVD player manufacturers by licensing the DVD format specification to them.

                                          22

1 | limitations. The NG Parties' conclusion that the doctrine of equivalents cannot apply to the terms
2 | "auxiliary device" and "set of codes" because it would create a meaning in direct opposition to
3 | those limitations is simply wrong.

4 | With respect to "auxiliary device" the NG Parties base their entire argument on their
5 | impermissible and overly narrow constructions. Because, they say, the term "internal" is directly
6 | opposite of "separate" and "external," the doctrine of equivalents does not apply.[64] This entire
7 | analysis is based not on the claim term itself, which merely states "auxiliary device," but upon
8 | the *NG Parties' proposed construction,* which as shown, *supra,* is incorrect. Each of the cases
9 | the NG Parties cite rely on the claim term itself, not the parties' proposed construction of that
10 | term. *See Freedman* 420 F.3d 1350, 1353 (Fed. Cir. 2005) (reciting representative claim 1,
11 | which includes the term at issue "slidably mounted," and adding emphasis to that term), *and*
12 | *Moore U.S.A. v. Std. Register Co.*, 229 F.3d 1091, 1095-96 (Fed. Cir. 2000) (reciting claim 1 of
13 | the relevant patent and emphasizing the disputed word "majority" in that claim). Here, the NG
14 | Parties advocate an overly narrow construction and then make the broad assertion that the
15 | application of the doctrine of equivalents runs counter to *their proposed construction* of that
16 | term. Of course it does. However, the mere presence of the phrase "such as" preceding "another
17 | VCR" highlights the NG Parties' attempt to improperly import extra limitations from the
18 | specification into the claims.

19 | With respect to "display 8," it was disclosed in the patent as a source of displayed
20 | information and was not a foreseeable modification. The patent even discloses that it can be a
21 | character generator.[65] Moreover, the patent categorizes the content of the auxiliary device as
22 | "alternative material," with further example, but no further restriction. The NG Parties cannot
23 | dispute that the "display 8" can display this "information" or "messages" from the "auxiliary
24 | device." The NG Parties also cannot dispute that the use of alternative "programming" from an
25 | auxiliary device "such as a VCR" was disclosed as merely one embodiment of the invention.[66]

26 |
27 |
---
[64] NG Parties Brief, at 23.
28 | [65] Hartsell Decl., Exh. 1('158 Patent) at 3:27-32.
[66] *Id.* at 5:60-61 ("the foregoing describes *only some embodiments of the invention*....").

23

1  Nothing in the specification or the claims prevents application of the doctrine of equivalents
2  based on the properly construed terms of the '158 Patent.

### 1. At a minimum, the accused devices meet the "auxiliary device" limitation under the doctrine of equivalents.

Even if the Court finds that having the auxiliary device inside the same "box" as the DVD reader does not support a finding of literal infringement, such a configuration certainly satisfies the "function, way, result" test required for infringement under the doctrine of equivalents. Under a doctrine of equivalents analysis, the "function" is merely to receive a signal according to the asserted claims (the independent claims do not require playback of any video material by the auxiliary device). The "way" is also the substantially the same: the specification of the patent requires only that the auxiliary device to be an alternate source of video signals and be connected to the microprocessor to enable a signal to be sent by the processor and received by the auxiliary device. The result is also the same – the auxiliary device receives the signal.

At a minimum, the "auxiliary device" limitation is met under the doctrine of equivalents.

### 2. "Suspended"

The "playing" versus "suspended" argument raised by the NG Parties is misplaced. Just as the arguments against "auxiliary device" and "set of codes" are based on flawed constructions, "suspended" is similarly situated. Even if the "feature presentation" had not begun to play before the DVD stopped spinning, the "video program" on the DVD is being read and played. If not, the "play" icon would not be shown. Accordingly, a fact issue exists as to whether what is read and displayed by the exemplar device constitutes "signals representative of a video program" or an equivalent thereof, and summary judgment is improper.

### 3. "Resumption Signal"

Guardian notes that the NG Parties completely omitted any briefing or argument regarding summary judgment concerning the doctrine of equivalents on this limitation. Guardian incorporates the arguments relating to the "suspension" limitation here.

### 4. "Set of Codes"

The doctrine of equivalents applies to the term "set of codes":

1       *Even if* the Court finds that a "set" means "two or more";

2       *Even if* the Court finds that the "standard code" or "country code" does not constitute a

3   "code" under the meaning of the claims; and

4       *Even if* the Court finds that the 16 bit "bit-field" representation of the parental control

5   setting is not 16 codes (i.e., each bit represents an individual code).

6       In essence, if a user selects "PG" as a rating code, the player will perform the compare

7   function against both "G" and "PG" movies. Likewise, if a user selects "R" as the maximum

8   allowable viewing setting, the player will compare the embedded code of the DVD against "G,"

9   "PG," "PG-13" and "R." At a minimum, a fact issue exists as to how a reasonable juror would

10  view the selection of a code (higher than "G") based on the various ratings that would necessarily

11  be compared to determine whether the encoded material represents one of the acceptable classes

12  of material allowed by the authorized user. Thus, the function is to block *unwanted* content. The

13  "way" is substantially the same – instead of selecting all of the allowable levels of content, the

14  user selects the *maximum* allowable content (thereby authorizing all lesser offensive levels), and

15  the result is more than substantially the same—it is identical. Therefore even if "set" means "two

16  or more," the doctrine of equivalents necessitates a finding of infringement, and summary

17  judgment is improper.

18                          **VI.    CONCLUSION**

19      For the many legal and factual reasons stated above, Guardian requests that the Court

20  deny the NG Parties' Motion for Summary Judgment in its entirety. Guardian further requests

21  that the "exemplar" products identified by the NG Parties be designated as the exemplary

22  products for all infringement issues in this case.

23

24

25

26

27

28

25

| | | |
|---|---|---|
| Dated: | July 12, 2009 | NEIL, DYMOTT, FRANK, MCFALL & TREXLER<br>A Professional Law Corporation |

By: _____/s Michael I. Neil_____
Michael I. Neil
Hugh A. McCabe
David P. Hall

and

Edward E. Casto, Jr.
Barry J. Bumgardner
Steven W. Hartsell
Attorneys for Plaintiff
Guardian Media Technologies, Ltd.