# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sony Electronics, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> Guardian Media Technologies, Ltd., <br><br> Defendant. <br>_____<br> Matsushita Electric Industrial Co., Ltd. and Victor Company of Japan, Ltd., <br><br> Plaintiffs. <br><br> vs. <br><br> Guardian Media Technologies, Ltd., <br><br> Defendant. <br>_____<br> Thompson, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> Guardian Media Technologies, Ltd., <br><br> Defendant. | CASE NO. 05cv1777 - IEG - AJB <br> consolidated with <br>     05cv1796 - IEG - AJB <br>     05cv1613 - IEG - AJB <br><br> RELATED CASE: <br>     08cv1859 - IEG - AJB <br><br> ORDER GRANTING SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 4,930,158 <br><br> [Doc. No. 182 (Case No. 05cv1777); Doc. No. 44 (Case No. 08cv1859)] |

|                                                                |
| -------------------------------------------------------------- |
| Guardian Media Technologies, Ltd.,                             |
|          Plaintiff, |
| vs.                                                            |
| Toshiba American Consumer Products, L.L.C. and Toshiba America, Inc., |
|          Defendants. |

These consolidated actions concern a patent dispute between the "Non-Guardian Parties" – five manufacturers/suppliers of consumer electronic products[1] – and Guardian Media Technologies, Ltd. ("Guardian"). The suit involves two patents, only one of which is relevant to the present motion: U.S. Patent No. 4,930,158 ("the '158 Patent"). Presently, the Non-Guardian Parties ("NG parties") move for summary judgment of non-infringement of the '158 patent. Guardian filed an opposition and the NG Parties replied. Having considered the parties' submissions, and for the reasons set forth below, the Court GRANTS summary judgment of non-infringement.

**BACKGROUND**

**A. The '158 Patent**

The '158 Patent, entitled "Selective Video Playing System," teaches an invention for managing objectionable content in video programs. The invention enables parents to prevent their children from viewing violent or sexually explicit programming. Issued in 1988, the '158 Patent describes and claims two "aspects" of the invention: (1) a device that prevents play of an entire video program of a certain classification and (2) a device that plays a video program, but replaces objectionable portions with substitute program material from another source. See (Pl. Motion, Ex. 1, '158 Patent, Col. 5, ln. 7-14.) The claims at issue involve only the second aspect of the invention.

The specification of the '158 patent describes the second aspect in detail. The patent teaches a system in which video programs contain codes that flag certain content, such as violent or sexually explicit material. As the video program is playing, the video player continually searches for these

---

[1] The "Non-Guardian Parties" are Plaintiffs Sony Electronics Inc., Thomson, Inc., Panasonic Corporation, and Victor Company of Japan, Ltd., and Defendants Toshiba America Consumer Products, L.L.C. and Toshiba America, Inc. ("Toshiba").

codes. When the video player detects a code, it suspends play of the video program and sends a signal to an "auxiliary device," a term with a disputed definition. The auxiliary device begins to play substitute content that replaces the violent or explicit content on the viewing screen. As the substitute content is being viewed, the video player advances the original program past the violent or explicit portion. Once the replacement content concludes playing, the original content resumes play, having skipped the offensive portions of the program.

Claims 8 and 19 of the '158 patent are directed to the second aspect of the invention, as are their respective dependent claims, claims 9-11 and 20-22. Claims 8 and 19 read:

> 8. A video recording playing method comprising the steps of
>   receiving from a video storage medium signals representative of a video program,
>   processing said signals to produce video signals of a form suitable for display,
>   detecting a code within the signal received from the storage medium,
>   comparing the detected code to a set of selected codes, and, according to a predetermined result of the comparison:
>   sending a signal to an auxiliary device,
>   causing playing of the video program to be suspended,
>   waiting until a resumption signal is received, and
>   resuming replay of the suspended program after
>
> 19. A video recording player comprising:
>   means for receiving, from a video storage medium, signals representative of a video program,
>   processing means for forming video signals of a form suitable for application to a video display means from said signals,
>   means for detecting a code within the signal received by the receiving means,
>   means for comparing the detected code to a set of selected codes, and
>   controller means for, according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received.

('158 Patent at 7:24-41(emphasis added) and 8:53-68 (emphasis added)). Both claims 8 and 19 require "sending a signal to an auxiliary device," "causing playing of the video program to be

suspended," and "comparing the detected code to a set of selected codes." The meaning and application of these terms underlies the present motion.

**B.      The Allegedly Infringing Products**

Guardian claims the NG Parties produce DVD players that contain infringing parental-control functions. To gain a better understanding of the parental-control functions at issue, counsel for the NG Parties conducted a demonstrative test on a Sony DVD player. (Gresalfi Decl. ISO of Pl. Motion, ¶¶ 13-235.) Counsel performed three tests: (1) playing a DVD with the parental control disabled; (2) playing the DVD with parental control enabled; and (3) playing the DVD with parental control enabled, but bypassing the function with an unlock code.

During the first test, after disabling the parental control function, counsel placed in the DVD player a disc of <u>Star Wars II: Attack of the Clones</u>. After closing the DVD player, the disc began spinning and a "title sequence" appeared in the following order: (1) a FBI warning, Figure 1; (2) an international copyright warning, Figure 2; (3) the Motion Picture Association of America ("MPAA") rating, Figure 3; and (4) a title menu, Figure 4




Figure 1: FBI warning                         Figure 2: International Copyright Warning




Figure 3: MPAA Rating                         Figure 4: Title Menu

During the second test, counsel enabled the parental control function, and again placed the Star Wars disc in the DVD player. After the tray closed, the screen went blank (Figure 5) before proceeding to the parental-control-menu, which read, "The Parental Level of the Player Has Been Set. Press 'Yes' to Continue." <u>See</u> Figure 6. The screen includes the options "Yes" and "Stop." Counsel selected STOP and the DVD ceased playing.




Figure 5: Blank Screen          Figure 6: Parental-Control-Menu

During the third test, Counsel enabled the parental control function. Once the Star Wars DVD was in the DVD player, the screen went blank. After a moment, the parental-control-menu appeared, which read, "The Parental Level of the Player Has Been Set. Press 'Yes' to Continue." <u>See</u> Figure 6. Counsel selected "Yes." A message then appeared, which read "Do you want temporarily change parental control to 8?"[2] <u>See</u> Figure 7. Counsel selected "Yes." Then a message stating, "parental control temporarily canceled" appeared on the screen. <u>See</u> Figure 8. Counsel entered a password and the message disappeared. The screen then displayed the four screens comprising the title sequence.




Figure 7          Figure 8

---

[2] Level 8 appears to correspond with a certain level of parental control.

1    Counsel also tested the products of the other NG Parties, all of which functioned in substantially
2 the same manner in all three tests.

**C.    Procedural Background**

After obtaining the patent in 1988, the inventor, Peter Vogel, unsuccessfully pursued licensing agreements with the NG Parties. In November 2003, Vogel assigned the patents to Guardian, which also pursued licensing agreements with the NG Parties.

In September 2005, following the break down of licensing negotiations, the NG Parties brought suit requesting a declaration that Guardian's patents were invalid, unenforceable, and not infringed. On its own motion, the Court consolidated the actions brought by the NG Parties.

At about the same time, the NG Parties filed *ex parte* petitions for re-examination of the two patents with the PTO. The PTO found substantial questions of patentability and granted both requests. On November 4, 2008, following full reexamination proceedings of the '158 patent, the PTO confirmed the patentability of claims 8-11 and 19-22 and cancelled claims 1-7 and 12-18.

On June 12, 2009, the NG Parties filed the motion for summary judgment of non-infringement of the '158 patent. The Court conducted a status conference regarding the motion on August 7, 2009 and heard oral argument on August 19, 2009.

## LEGAL STANDARDS

**I.    Motion for Summary Judgment**

Summary judgment is proper where the pleadings and materials demonstrate "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A material issue of fact is a question a trier of fact must answer to determine the rights of the parties under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. Summary judgment may be granted where the moving party shows "an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325; see Nissan Fire & Marine Ins. Co., v. Fritz Cos., 210 F.3d 1099, 1106 (9th Cir. 2000).

The moving party bears "the initial responsibility of informing the district court of the basis for

its motion." Celotex, 477 U.S. at 323. To satisfy this burden, the movant must demonstrate that no genuine issue of material fact exists for trial. Id. at 322. However, the moving party is not required to negate those portions of the non-moving party's claim on which the non-moving party bears the burden of proof. Id. at 323. To withstand a motion for summary judgment, the non-movant must then show that there are genuine factual issues which can only be resolved by the trier of fact. Reese v. Jefferson School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir.2000) (citing Fed. R. Civ. P. 56; Celotex, 477 U.S. at 323). The nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact. Nissan, 210 F.3d at 1103. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion, but conclusory allegations as to ultimate facts are not adequate to defeat summary judgment. Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1180 (9th Cir. 2002). The court is not required "to scour the record in search of a genuine issue of triable fact," Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996), but rather "may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).

## II.    Patent Infringement and Claims Construction

A determination of patent infringement requires a two-step analysis. PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1362 (Fed. Cir. 2005). First, the Court must ascertain the scope of the claims as a matter of law. Id. Second, the Court must compare the properly construed claim to the accused device or process. Id. This second step is a question of fact; however, if there is no genuine issue of material fact in dispute, summary judgment is proper. Id.

During the first step, the Court determines the meaning of the patent's claims, which define the scope of the patented invention. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)(en banc). In construing patent claims, the Court must first evaluate the intrinsic evidence, which includes the language of the claims themselves, the specification of the patent, and the prosecution history. Id. at 1312-1317. However, not all intrinsic evidence is equal: the language of the claim is given primary importance. The Federal Circuit has warned, "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those

embodiments." Id. at 1323. After completing the intrinsic evaluation, a court may consider extrinsic evidence only if "a disputed claim term remains ambiguous after analysis of the intrinsic evidence." Pickholtz v. Rainbow Technologies, Inc., 284 F.3d 1365, 1372-73 (Fed. Cir. 2002). Extrinsic evidence is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317.

During the second step, the Court must determine whether the accused products either literally infringe the patent or, alternatively, if they infringe the patent under the doctrine of equivalents. Literal infringement occurs when "all of the elements of the claim, as correctly construed, [are] present in the accused device." TechSearch, LLC v. Intel Corp., 286 F.3d 1360, 1371 (Fed. Cir. 2002). Where literal infringement is not present, infringement under the doctrine of equivalents may be found where the "accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." Warner-Jenkison Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 40 (1997).

## DISCUSSION

The NG Parties offer three reasons the accused DVD players do not infringe the '158 patent. First, they contend their products do not contain an "auxiliary device." Second, the NG Parties believe the accused devices do not "compare the detected code to a set of selected codes." The parties dispute the meaning of all these terms, therefore, the Court must construe the terms before making an infringement determination. Third, the Non-Guardian Parties contend a "video program" is not "suspended" or "resumed" when played on the DVD players of the NG Parties.

**I.      AUXILIARY DEVICE**

*A.      Claim Construction*

| TERM | NON-GUARDIAN PARTIES' PROPOSED CONSTRUCTION | GUARDIAN'S PROPOSED CONSTRUCTION |
|---|---|---|
| Auxiliary Device | A playback device, such as another VCR, that is physically separate from the video player that plays back the video program, and is the source of substitute material | A substitute source of video material, where such material may include messages, information, advertisements or other video programs. |

Claim 8 uses the term "auxiliary device" in the following context: "sending a signal to an auxiliary device." Claim 19 uses the exact same terminology.

i. Parties' Arguments

The NG Parties argue "auxiliary device" means "a playback device, such as another VCR, that is physically separate from the video player that plays back the video program, and is the source of substitute material." First, the NG Parties rely on the plain meaning of the phrase "sending a signal to an auxiliary device." They believe the verb "sending to" means the auxiliary device is external to the video player because a device cannot send a signal to itself. Second, the Non-Guardian Parties argue the specification exemplifies the "auxiliary device" only by reference to external devices such as "a second video player," "another VCR," or "a VCR."

Guardian believes "auxiliary device" means "a substitute source of video material, where such material may include messages, information, advertisements or other video programs." Guardian believes their construction is consistent with the findings of the PTO's reexamination of the patent. Further, Guardian contends the PTO rejected the definition proposed by the NG Parties.

In its reply, the NG Parties contest Guardian's use of "substitute." They assert the auxiliary device is "the source of substitute material" not "a substitute source of video material." The NG Parties believe Guardian's construction avoids the essence of the claimed invention: replacing material from the main program. Further, the NG Parties argue the auxiliary devices at issue do not replace anything.

ii. Analysis

The first issue is whether the auxiliary device need be external to the video player system. The Court first turns to the language of the claim. Both claim 8 and claim 19 include the phrase "sending a signal to an auxiliary device." Generally, a device cannot send a signal to itself; therefore, the video player and auxiliary device must be separate and distinct components of the system. However, neither claim 8 or claim 19 discusses whether the *system* must be located either inside or outside of one enclosure. When reasonably read, the claims' limitations would allow both components – the video player and auxiliary device – to be housed in same enclosure. The silence of the claims on the issue of physical separation weighs against reading a "physically separate" limitation into the claim.

Moreover, the specification is also silent on the issue of the proposed "physically separate" limitation. According to the specification, the "auxiliary device" provides substitute material to replace material from a main program:

> If a REPLACE code is detected, a signal is sent to auxiliary output . . .
> . On receipt of this signal, an auxiliary device, such as another VCR, responds by playing another recording, and an auxiliary switching device selects the substitute material to be displayed . . .
> . . .
> When the auxiliary device has finished replaying the substitute program, it sends a signal to auxiliary input . . . which causes replay of the first program to resume.

('158 Patent, at Col. 5:25-41.) Although the specification contains an example of an auxiliary device, "another VCR," it does not explicitly require the auxiliary device be external to the enclosure that contains the video player. Furthermore, after scouring the remainder of the specification, the Court finds no support for the physically separate requirement. Accordingly, the specification weighs against reading a "physically separate" limitation into the claim.

The NG Parties fail to appreciate the difference between an exemplar and a requirement. The specification includes two exemplars of the "auxiliary device" that are external devices. First, the specification states, "[o]n receipt of this signal, an auxiliary device, such as another VCR, responds by playing another recording . . . ." (The '158 Patent, 5:27-30.) Later, the specification again describes the auxiliary device as an external device, "In this case, the auxiliary device can be a VCR which plays a recording comprising a number of advertisements or messages . . . ." (The '158 Patent, 5:48-50.) Although these examples prove the auxiliary device *may* be external, it does not necessarily follow that the device *must* be external. See, e.g., Varco, L.P. v. Pason Systems USA, Corp., 436 F.3d 1368, 1373 (Fed. Cir. 2006) ("'In examining the specification for proper context . . . this court will not at any time import limitations from the specification into the claims.'"). Accordingly, this language does not support the position of the NG Parties.

The second issue is whether the auxiliary device is "the source of substitute video material" or "a substitute source of video material." Despite Guardian's protestations, this is a distinction with a difference. A review of the specification reveals that the sole purpose of the auxiliary device is to provide "substitute video material." The specification states the patent's purpose is "directed to providing means for *replacing* unwanted program with programme [sic] from another source." (Gresalfi Decl., Ex. 1, at A.9: 5:12-15) (emphasis added). Further, at oral argument, Guardian agreed the auxiliary device provides substitute video material. Guardian's construction improperly implies the auxiliary device is a substitute source, not a source of substitute material. This would mean an

1 auxiliary device could provide the same video material, as long as it was generated from a different
2 source. This would clearly fail to reflect the purpose of "providing means for replacing unwanted
3 program with program from another source." Accordingly, the Court finds the auxiliary device is "the
4 source of substitute video material."

5 The third issue is whether to include the final sentence of Guardian's proposed construction,
6 in which it defines "video material" as "may include messages, information, advertisements, or other
7 video programs." Turning to the intrinsic record, the specification teaches that substitute material may
8 include "information," "advertisements," "messages," or "substitute programs." (Gresalfi Decl., Ex.
9 1., at A.9: 5:39, 48, 50-51.) However, because the specification cannot act as a limitation unto itself,
10 the construction should not constrain the term "video material" to these categories. Accordingly, the
11 Court includes the phrase "video material, where such material may include messages, information,
12 advertisements, or other video programs."[3]

iii. Construction

The Court construes the term "auxiliary device" as "the source of substitute video material, where such material may include messages, information, advertisements or other video programs."

B. *Literal Infringement*

i. Parties' Arguments

Guardian asserts the accused devices contain an "auxiliary device." According to both parties, when a DVD recording is suspended because it exceeds the parental control settings, a parental control warning and override message is displayed. Guardian believes this message is generated from "flash" or "one time programmable (OTP)" memory installed in the accused devices. From this, Guardian concludes the flash or OTP memory is an auxiliary device because it is the source of the parental-control-menu, which replaces the normal DVD function. Guardian presents the testimony of its expert, Richard Ferraro, in support of this conclusion.

---

[3] After oral argument, the NG Parties filed a supplemental letter brief arguing the Court should apply the doctrine of collateral estoppel to determine the proper construction of the term "video program." The NG Parties argue this Court is bound by the Central District's construction of that term in the case *Guardian v. Coby*, Case No. 2:08cv08439, which also concerned the '158 patent. The Court will not consider this argument, raised by the NG Parties for the first time after extensive briefing and oral argument on the summary judgment motion.

1  The NG Parties argue their DVD players do not have an external, auxiliary device. Moreover,
2 the NG Parties argue a flash or OTP do not provide replacement material. Further, the NG Parties
3 argue these internal components are independently mentioned in the patent; therefore, cannot be
4 auxiliary devices.

ii. <u>Analysis</u>

The issue is whether the flash or OTP memories are "the source of substitute video material, where such material may include messages, information, advertisements or other video programs." It is undisputed the parental-control-menu originates from the flash or OTP memory. Further, a jury could only find the parental-control-menu is video material, where such material includes messages, information, advertisements or other video programs. Accordingly, the sole dispute is whether the parental-control-menu is "*substitute* video material."

To determine whether the parental-control-menu is substitute video material, the Court turns to the demonstrative tests conducted by the counsel for the NG parties using the <u>Star Wars II</u> DVD. First, counsel tested the device with the parental-control settings turned off. He turned on the player and the screen displayed the title sequence: (1) the FBI warning screen, (2) the international copyright screen, (3) the MPAA rating screen, and (4) the title menu.

Later, counsel conducted a different test with the DVD player's parental-control settings enabled. He turned on the player and the screen displayed a parental-control menu overlaying a 20th Century Fox logo. When counsel entered the parental control pin, the parental-control menu disappeared and the title sequence began running. All four screens of the title sequence appeared.

When reviewing this evidence, it is important to note the parental-control-menu did not *replace* any content. Instead, the parental-control-menu merely *delayed* the play of the title sequence. Once counsel entered the parental-control pin, the screen showed all four screens of the title sequence. As such, the parental-control-menu is not *substitute* video material. Because the flash or OTP memories only provide the parental-control-menu, which is not substitute video material, the flash or OTP memories are not auxiliary devices. Based on this evidence, a reasonable jury could only conclude the accused DVD players do not literally infringe the '158 patent.

Accordingly, the Court finds there is no literal infringement.

1  C.    *Doctrine of Equivalents*

2  i.    <u>Parties Arguments</u>

The NG Parties argue that there is no infringement under the doctrine of equivalents because the internal flash or OTP memory cannot be equivalent to an external device. Further, the NG Parties argue that the '158 patent discloses this type of internal flash or OTP memory, but does not identify it as an auxiliary device. Accordingly, the NG parties argue Guardian is subject to prosecutorial estoppel.    Guardian believes the accused devices meet the "auxiliary device" limitation under the doctrine of equivalents. Guardian implements the "function, way, result" test, focusing on the physically separate requirement proposed by the NG Parties. Guardian argues the function is merely to receive a signal because the independent claim does not require playback. The "way" is the same because the "auxiliary device" is still the alternate source of video signals and connected to the microprocessor to enable a signal be sent by the processor and received by the auxiliary device.

ii.    <u>Analysis</u>

The DVD players do not infringe under the doctrine of equivalents because there is no equivalent of the auxiliary device. Although the independent claim does not require playback, it requires the existence of an auxiliary device. The parties agree that the auxiliary device must be a source of video material. Further, as discussed above, the video material must be *substitute* video material. As used in the patent, "substitute" is a synonym for "replace." The parental-control-menu, which is the only video material generated by the flash or OTP memory, does not replace anything. Because the flash or OTP memory do not provide substitute video material, or the equivalent substitute material, the DVD players do not infringe the '158 patent under the doctrine of equivalents.

D.    *Conclusion*

For the foregoing reasons, the Court GRANTS summary judgment of non-infringement.

## II.    SET OF SELECTED CODES

Even if the allegedly infringing products contained auxiliary devices, the Court also finds the products do not "compar[e] the detected code to a set of selected codes."

///

///

A.  *Claim Construction*

| TERM | NON-GUARDIAN PARTIES' PROPOSED CONSTRUCTION | GUARDIAN'S PROPOSED CONSTRUCTION |
|---|---|---|
| "Comparing the detected code to a set of selected codes" | Comparing a detected program classification code to more than one code, each of which has been assigned a value by the user | Comparing a detected program classification code to one or more user selected codes. |

Both Guardian and the NG Parties agree that "comparing the detected code" means "comparing a detected program classification code." The sole dispute centers on the term "to a set of selected codes," which appears in claims 8, 9, 19, and 20.

i.  Parties' Arguments

The NG Parties urge the Court to define "set of selected codes" as "more than one code." They argue the phrase "set of codes" is clearly plural, therefore, requires the inclusion of multiple codes. In their reply, the NG Parties make a cursory reference to the specification.

Guardian argues "set of selected codes" means "one or more user selected codes." First, Guardian relies on mathematical definitions. Guardian cites the definition of the word "singleton" in Webster's dictionary, which means "a set consisting of one given element." (Harsell Decl. ISO Def. Motion, Ex. 7 at 5.) Additionally, Webster's defines a "set" as "a collection of objects or elements classed together." Id. Further, Guardian cites two cases finding "set" to have a plain meaning of "one or more." Dow Jones & Co. v. Ablaise, Ltd., 2007 U.S. Dist. LEXIS 49750, at *12 (D.D.C. July 11, 2007); Power-One, Inc. v. Artesyn Techs., Inc., 2007 U.S. Dist. LEXIS 20458, at *26-27 (E.D. Tex. Mar. 22, 2007).

Moreover, Guardian believes the NG Parties represented to the PTO that a "set" means "one or more" during reexamination. Guardian asserts the NG Parties argued a prior art reference involving "one or more" codes satisfied the "set of selected codes" limitation in the '158 patent. (Hartsell Decl, Ex. 16, "Request for Ex Parte Reexamination" at 15.) The PTO agreed and found when a user selects "one or more rating levels," a set has been selected. Id. at 5, 12. Guardian believes the Court should not allow this inconsistent argument because the NG parties violated their duty to act with "candor and good faith" during reexamination, citing Ball Corp. v. Xidex Corp., 967 F.2d 1440 (10th Cir. 1992).

i.    Analysis

The claim language supports the proposed construction by the NG Parties. Regardless of how the Court defines the word "set," the Court's interpretation of the word "codes" is dispositive. Turning to the language of the claim, the patentee decided to use the plural word "codes" when defining the contents of the set. This indicates he intended the contents of the set to be multiple selected codes. If he had intended the set to contain only one code, he could have used the singular word "code." Accordingly, the use of the plural "codes" weighs in favor of the NG Parties' construction.

This inference is supported by the claim language adjacent to the disputed term. The patentee used the word "code" earlier in the claim element. Specifically, the claim requires the "comparing of the detected <u>code</u> to a set of selected <u>codes</u>." The use of the singular "detected code," closely followed by the plural "codes," indicates an intent to distinguish between the plural and singular forms. Accordingly, the claim language supports the definition proposed by the NG Parties.

The specification does not compel a different conclusion. Throughout the specification, the patent only exemplifies "set of codes" as multiple codes. (<u>See</u> '158 Patent, Col. 3:37 - 4:31.) For example, in column four of the patent, the specification describes an embodiment where the set of codes is comprised of "three bits, corresponding to the classifications: (1) Violent, (2) Sexually explicit, and (3) Adult only." ('158 Patent, 4:11-15.) Although the specification cannot impose additional limitations into the claim, in this case, it reinforces the plain meaning of the claim.

The "duty of candor and good faith" does not estop the NG Parties from presenting their definition. The "duty of candor and good faith" requires parties to a patent reexamination to "bring materials to the attention of the PTO as they 'are aware, or become aware' of them." <u>Ball Corp.</u>, 967 F.2d at 1447. This duty is codified at 37 C.F.R. § 1.555, which only addresses the duty to disclose information. The section simply does not apply to arguments made during the reexamination. During reexamination, the NG Parties argued a specific piece of prior art, the Chard reference, allowed "a user to select one or more rating levels that will be blocked, for both video and audio, thereby 'enabling selection of a of a set of classification codes.'" (Hartsell Decl., Ex. 16 at 12.) Guardian does not

indicate what materials were withheld from the PTO, therefore, the Court rejects this argument.[4]

The extrinsic sources submitted by Guardian are unpersuasive. Guardian submits the declaration of Richard Ferraro, an expert in the field. Ferraro believes one ordinarily skilled in the art would understand "set of selected codes" to mean "one or more selected codes." (Ferraro Decl., Ex. 11 to Hartsell Decl., ¶99.) However, the opinion is conclusory and only addresses the definition of "set" without explaining why "codes" would mean one code.

In sum, the language of the claim, the specification, and extrinsic sources all support the proposed construction of the NG Parties.

iii.     Construction

The Court construes the term "comparing the detected code to a set of selected codes" as "comparing a detected program classification code to more than one code, each of which has been assigned a value by the user."

*B.     Literal Infringement*

i.     Parties' Arguments

The NG Parties argue their products do not compare a code to a set of selected codes because the MPAA age rating system only provides for comparison to a single code. The NG Parties contrast the MPAA system with the U.S. TV Parental Guidelines, which provide for separate and independent content labels D, L, S, V, FV to indicate whether a program contains suggestive dialogue, course or crude language, sexual situations, violence, or fantasy violence.

Guardian argues there is no dispute the DVD players compare a detected MPAA rating code from a DVD to preselected codes with the DVD player. Guardian argues, even if the NG Parties' definition applies, the user can set a rating code *and* a country code. Guardian argues the country code is used exclusively in the parental control system. Further, Guardian argues, the code selected by the user is translated into a 16 bit bit-field as a series of 16 contiguous 1s and 0s.[5]

---

[4] Moreover, even if a reviewing court believed estoppel could apply, the statement regarding the Charad reference is not in direct contradiction to the current position of the NG parties. The NG Parties noted the Charad reference allowed a user to select ratings levels for both the video or audio. This would require the selection of two codes, a.k.a., more than one code.

[5] A "bit-field" is a field containing only binary characters, such as 1s and 0s.

ii. <u>Analysis</u>

The accused DVD players are pre-programmed at the factory to recognize and process the various rating codes, roughly corresponding to the well-known MPAA rating system. (Hartsell Decl., Ex. 17, ¶ 3.) To set parental control, a user selects codes using the "Custom Parental Control" menu on the accused DVD players. <u>Id.</u>, ¶2. Once the Custom Parental Control menu is accessed, "the user can set a parental control level of 1 to 8, with 1 being the most restrictive ("G rated") and 8 being the least restrictive. <u>Id.</u>, ¶ 3. Once the user sets the code and places the DVD in the DVD player, the player detects the rating code on the DVD and compares it to the user selected code. For example, when attempting to play the <u>Star Wars II</u> DVD, the DVD player reads the code on the DVD – in this case a PG rating – and compares it to the code selected by the user. During the demonstrative test, when the user selected a code 1, the player compared the detected PG code to the user selected code, and blocked play of the program. The player did not compare the PG rating to multiple codes, instead it only compared it to the G rating selected by the user. Accordingly, the player only compares the code to one code, not a set of selected codes.

The country code is a red herring. When the user accesses the "Custom Parental Control" menu to set the parental-control level, the user can also set a country code. (Hartsell Decl., Ex. 17.) On the "Custom Parental Control" menu, three options appear: (1) "level," (2) "standard," and (3) "change password." <u>See</u> Figure 9, below. The "level" option allows the user to set the parental-control level of 1 through 8. The "standard" option allows the user to set the country code by selecting a variety of countries.



1 This country code determines what a selection of 1 or 8 means, depending on the country. For
2 example, if the user enters a 1 in the United States, it might not be the same as a 1 in the United
3 Kingdom. Once the user selects the country code, the player translates the parental-control level based
4 on the country selected. Critically, this translation occurs before any code is read off of the DVD.
5 Once the DVD begins playing in the machine, the DVD player detects the rating code and compares
6 it to the translated parental-level rating code selected by the user. The timing of this is important
7 because the country code translates the meaning of the parental-level rating code prior to the DVD
8 playing. The comparison required by the claim occurs while the DVD is playing, when the player
9 compares the DVD rating to the translated, singular code. Therefore, the accused DVD player is not
10 comparing the detected code to a set of codes.

Guardian's 16 bit bit-field argument is misplaced. The patent requires "[c]omparing the detected code to a set of selected codes." The patent focuses on the actions taken by the user in selecting the codes, not the form those codes ultimately take once inputted and processed by the machine. Undoubtedly, as binary numbers drive the technology at issue, the machine translates any user-action into a string of binary numbers. Regardless, the patent is unconcerned with what the machine does; user-selection drives the claim. Therefore, Guardian's argument is unpersuasive.

For the foregoing reasons, the Court finds there is no literal infringement.

*C.      Doctrine of Equivalents*

i.      Parties' Arguments

Alternatively, Guardian argues the accused DVD players infringe under the doctrine of equivalents. Guardian argues if a user selects "PG" as a rating code, the player will perform the compare function against both "G'" and "PG" movies. The NG parties do not address this argument.

ii.     Analysis

Guardian's argument fails because the selection of a single code, that happens to encompass another code, is not sufficient under the doctrine of equivalents. See Moore U.S.A., Inc. v. Standard Register Co., 229 F.3d 1091,1106 (Fed. Cir. 2000) ("[T]he term 'majority' is not entitled to a scope of equivalents covering a minority . . . [I]t would defy logic to conclude that a minority – the very antithesis of a majority – could be insubstantially different from a claim limitation requiring a majority . . . .") Likewise, the term "codes" is not entitled to a scope of equivalents covering "code." Like in

Moore, it would defy logic to make a distinction between "code" and "codes" during claim construction, then find "codes" meant "code" under the doctrine of equivalents. Accordingly, the Court finds the product does not infringe under the doctrine of equivalents.

*D.     Conclusion*

For the foregoing reasons, the Court GRANTS summary judgment of noninfringement.

**III.    CAUSING PLAYING OF THE VIDEO PROGRAM TO BE SUSPENDED**

The parties extensively brief, and strenuously dispute, the meaning of the term "causing playing of the video program to be suspended." However, regardless which definition of the term the Court adopts, the evidence presented in support of the infringement argument creates a genuine issue of material fact that precludes summary judgment. Specifically, there is a dispute about the differences in the parental coding of two DVDs lodged with the court: Star Wars II and Species II. The fact is material because it impacts what screen images the user sees once the DVD is placed in the DVD player. Because this dispute of material fact exists, this issue is not amenable to summary disposition.

**CONCLUSION**

For the foregoing reasons, the Court:

(1)    GRANTS summary judgment of non-infringement of the '158 patent because the accused players do not contain an "auxiliary device";

(2)    alternatively GRANTS summary judgment of non-infringement of the '158 patent because the accused devices do not "compare a detected code to a set of codes"; and

(3)    declines to reach the issue whether the accused devices "cause playing of the video program to be suspended."

IT IS SO ORDERED.

**DATED: August 31, 2009**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**